**PRECEDENTIAL**


UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 05-4430
_____



MIGUEL MONTANEZ

v.

PAT THOMPSON, RECORD SPECIALIST I, STATE
CORRECTIONAL INSTITUTION AT ALBION;
JOHN DOE, I SUPERVISOR OF INMATE RECORDS,
STATE CORRECTIONAL INSTITUTION AT ALBION;
JOHN DOE, II, SUPERVISOR OF INMATE RECORDS,
STATE CORRECTIONAL INSTITUTION AT
GRATERFORD; SUPERINTENDENT, PHILADELPHIA
PRISON SYSTEM; ROBERT DURISON, DIRECTOR,
CLASSIFICATION, MOVEMENT & REGISTRATION,
PHILADELPHIA PRISON SYSTEM

PAT THOMPSON,

Appellant.

_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civil No. 03-cv-6713)
District Judge: Honorable Juan R. Sanchez

_____

Argued January 26, 2010

Before:  FUENTES, FISHER, *Circuit Judges,* and KANE,[*]
*Chief District Judge.*

(Filed: April 22, 2010)

_____

Thomas W. Corbett, Jr., Esq.
Claudia M. Tesoro, Esq. (Argued)
John G. Knorr, III, Esq.
Office of Attorney General
21 South 12th Street
Third Floor
Philadelphia, PA 19107

   *Counsel for Appellant*

_____

     * Honorable Yvette Kane, Chief Judge of the United
States District Court for the Middle District of Pennsylvania,
sitting by designation.

Miguel Montanez
4245 North Fairhill Street
Philadelphia, PA 19140

> *Pro Se Appellee*

Craig R. Gottlieb, Esq.
City of Philadelphia
Law Department
1515 Arch Street
One Parkway
Philadelphia, PA 19102

> *Counsel for Appellee Robert Durison*

Marianne Consentino, Esq.
M. Jared Littman, Esq. (Argued)
Harkins Cunningham LLP
2800 One Commerce Square
2005 Market Street
Philadelphia, PA 19103

> *Counsel for Court Amicus on Behalf of Appellee*

―――――――――

OPINION OF THE COURT

―――――――――

KANE, *Chief District Judge*.

This is an interlocutory appeal by Pat Thompson ("Thompson"), a Pennsylvania Department of Corrections ("DOC") Records Specialist at SCI Albion, from the District Court's order denying her motion for summary judgment based on qualified immunity. In an action brought under 42 U.S.C. § 1983, Plaintiff Miguel Montanez ("Montanez") alleges that he was incarcerated beyond the expiration of his maximum term of imprisonment as a result of the Defendants' deliberate indifference in responding to his inquiries and challenges. Because we find that we may properly exercise appellate jurisdiction over this appeal and that Thompson was entitled to qualified immunity on this claim, we will reverse.

## I.  BACKGROUND

On August 11, 1992, Judge Quinones of the Court of Common Pleas sentenced Montanez for burglary, imposing a maximum 60-month term of imprisonment with a 30-month minimum term,[1] effective July 23, 1992 ("Quinones Sentence"). As such, his period of incarceration on this sentence ran through July 23, 1997. On January 28, 1995, shortly after his minimum term of imprisonment had expired, the Pennsylvania

---

[1] Under Pennsylvania law, the "maximum term" represents the sentence imposed for a criminal offense. The minimum term merely sets a date after which the prisoner may be paroled. Martin v. Pennsylvania Bd. of Prob. and Parole, 840 A.2d 299, 302 (Pa. 2003).

Board of Probation and Parole ("Parole Board") paroled Montanez from the Quinones Sentence.

On February 9, 1996, after about a year at liberty from the Quinones Sentence, Montanez was arrested and detained on several new state charges, including multiple counts of luring a child into a motor vehicle, harassment, open lewdness, indecent exposure, and corrupting the morals of a minor. Montanez first went to trial on these charges in Philadelphia Municipal Court, where he was convicted after a bench trial; the municipal court sentenced him on April 30, 1996, to a 60-month maximum term of imprisonment with a 30-month minimum term. Montanez appealed the conviction to the Court of Common Pleas on May 24, 1996, nullifying the conviction and sentence of the municipal court.[2] Over a year later, on June 9, 1997, he pleaded guilty to the charges before Judge Smith of the Court of Common Pleas and was again sentenced to a 60-month maximum term of imprisonment with a 30-month minimum term ("Smith Sentence"). The court's judgment did not provide Montanez with any credit for time served while awaiting his sentence.

While the proceedings were underway against Montanez for these new charges, the Parole Board lodged a detainer against him for possible violation of his parole on the Quinones Sentence. The Parole Board held a hearing on July 29, 1996, and found that Montanez was a convicted and technical parole violator. He was recommitted on the Quinones Sentence to serve 36 months of

---

[2] A defendant convicted in municipal court has an automatic right to appeal his conviction to the Court of Common Pleas for a trial de novo. See 42 Pa. Con. Stat. Ann. § 1123

5

backtime as a convicted violator and recommitted to serve a concurrent six months of backtime as a technical violator. Despite this, the Parole Board later realized that recommitting Montanez as a convicted violator was untimely, likely due to confusion resulting from the nullification of Montanez's municipal court conviction. The Parole Board eventually rescinded the 36-month backtime sentence on November 26, 1997, but retained its finding that Montanez was a technical violator. Accordingly, only the Parole Board's six-month recommitment for Montanez's technical violation was left intact. The Parole Board order rescinding the 36-month sentence noted that the case was retroactively closed effective July 23, 1997, the maximum release date on the Quinones Sentence.

After the Quinones Sentence had officially expired, Montanez remained in prison on the Smith Sentence. Montanez's first contact with Thompson occurred on October 10, 1998, when he submitted an inmate request form seeking copies of his commitment papers.[3] (App. at 90.) Thompson responded that he would have to submit a fee of $.10 for each copy of commitment papers before she could process his request. Shortly after receiving Thompson's response, on October 16, 1998, Montanez

---

[3] Montanez had also brought his concerns regarding his sentence to Robert Durison, Director of Classification, Movement, & Registration for the Philadelphia Prison System. While named as a codefendant in this case, Durison did not argue he was entitled to qualified immunity before the District Court. Thus, he was not able to file an interlocutory appeal of the District Court's denial of his motion for summary judgment.

was transferred from SCI Albion to Philadelphia County Prison, and there is no indication that he followed through with his initial document request at that time. Montanez served time in county custody until January 26, 2001, and, upon returning to the state prison system, resumed his communications with Thompson. On May 22, 2001, he submitted another inmate request form, in which he sought, *inter alia*, information about commitment credit and his commitment papers from Judge Smith. (App. at 91.) As to his question about commitment credit, Thompson responded that she had sent a letter to Judge Smith regarding Montanez's commitment credit on February 8, 2001. She further noted that no commitment credit would be applied towards Montanez's sentence until the records office received a response from Judge Smith because "it is not appropriate to give pre-commitment credit for time being served in satisfaction of a separate and distinct sentence." (Id.) Although there is no indication in the record that Judge Smith responded to Thompson's inquiries, Montanez's DOC record reveals that at some point he received 30 days of commitment credit on the Smith Sentence for this incarceration period: (1) five days for the period between his arrest and the lodging of the Parole Board's detainer, and (2) 25 days for the period between his municipal court conviction and the filing of his appeal to the Court of Common Pleas. Eventually, after a review of Montanez's sentence computation, Thompson and her superiors determined Montanez was entitled to full commitment credit for time served during his incarceration between arrest on the new charges (February 9, 1996) and eventual sentencing by Judge Smith (June 9, 1997). After application of this credit, Montanez had served the maximum

7

term of imprisonment on the Smith Sentence. As such, on December 15, 2001, Montanez was released.

Montanez filed a complaint in the District Court on October 6, 2005, alleging that the named Defendants took ineffectual action in resolving the supposed errors in his sentencing calculation, resulting in violations of his constitutional rights. Initially, Thompson filed a motion to dismiss the complaint partly on the basis of qualified immunity, which the District Court denied. When discovery was completed, Thompson filed a motion for summary judgment, again based partly on qualified immunity. The District Court denied this motion without elaboration. Thompson then moved for reconsideration, which the District Court also denied without elaboration.

Thompson thereafter timely filed this interlocutory appeal. In response to Thompson's notice of appeal, the District Court entered a memorandum opinion explaining its prior denial of Thompson's motion for summary judgment. The District Court noted that the parties had advanced different calculations of Montanez's maximum release date and found that the difference in proposed release dates presented a factual dispute that precluded entry of summary judgment:

> Montanez believes his release date should have been February, 2001. The state argues his release in December, 2001 was too early because Montanez was never reparoled after serving his six months' back time and, therefore, he did not begin serving Judge Smith's two-to-five year sentence until July 23, 1997. The difference in dates

8

presents a factual question which prevents the entry of summary judgment in favor of Defendant Thompson.

(Dist. Ct. Op. at 2.) The District Court held, without explanation, that evaluating these disparate calculations and determining the correct maximum release date was a question of fact for the jury to decide. The District Court also noted that the jury would need to determine whether Montanez adequately demonstrated that Thompson acted with deliberate indifference to succeed on his Eighth Amendment claim. Additionally, the District Court determined that, if Montanez was held beyond his maximum term of imprisonment, Thompson would not qualify for qualified immunity because there is a clearly established right "not to be held." (Dist. Ct. Op. at 5.)

## II. DISCUSSION

The District Court had jurisdiction over Montanez's federal civil rights claims pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3). Our jurisdiction is contested. We necessarily exercise *de novo* review over an argument alleging a lack of appellate jurisdiction. Reilly v. City of Atlantic City, 532 F.3d 216, 223 (3d Cir. 2008). To the extent that we do have jurisdiction to entertain this appeal, "[w]e review the denial of a motion for summary judgment *de novo*. We apply the same test required of the district court and view inferences to be drawn from the underlying facts in the light most favorable to the nonmoving party." Bayer v. Monroe County Children and Youth Serv., 577 F.3d 186, 191 (3d Cir. 2009) (quoting Haybarger v. Lawrence County Adult Prob. & Parole, 551 F.3d 193, 197 (3d Cir. 2008)).

## A. Jurisdiction

Montanez argues that we do not have jurisdiction to entertain the issues raised in this interlocutory appeal. Typically, a denial of summary judgment is not a final appealable order, but the Supreme Court has held that "a district court's denial of a claim of qualified immunity, to the extent that it turns on an issue of law, is an appealable 'final decision' within the meaning of 28 U.S.C. § 1291 notwithstanding the absence of a final judgment." Mitchell v. Forsyth, 472 U.S. 511, 530 (1985). The Supreme Court has made clear, however, that this qualified immunity exception does not include interlocutory appeals of a district court's evidence sufficiency determinations at summary judgment, "i.e., which facts a party may, or may not, be able to prove at trial." Johnson v. Jones, 515 U.S. 304, 313 (1995). Accordingly, "our jurisdiction to review the District Court's order denying summary judgment depends on whether the defendants' appeal raises pure questions of law or whether it challenges the District Court's determination of which facts were sufficiently supported by evidence." Reilly, 532 F.3d at 224 (quoting Blaylock v. City of Philadelphia, 504 F.3d 405, 409 (3d Cir. 2007)). For instance, an appeals court cannot review whether the district court erred in denying a qualified immunity motion because the judge was mistaken as to the facts that are subject to genuine dispute. See Forbes v. Twp. of Lower Merion, 313 F.3d 144, 147 (3d Cir. 2002). Our review in these circumstances is therefore somewhat analogous to the review of a Rule 12(b)(6) motion, "where we would not evaluate the underlying evidence to support the plaintiff's claims which the District Court chose to accept." Walter v. Pike County, Pa., 544 F.3d 182, 190 (3d Cir. 2008) (quoting Atkinson v. Taylor, 316 F.3d 257, 261 n.4 (3d Cir.

2003)). Despite this, we may review "whether the set of facts identified by the district court is sufficient to establish a violation of a clearly established constitutional right." Reilly, 532 F.3d at 224 (citing Forbes, 313 F.3d at 147). Additionally, "[i]f there are minor gaps in the District Court's factual recitation, 'we can determine what facts the district court, in the light most favorable to the nonmoving party, likely assumed.'" Walter, 544 F.3d at 190 (quoting Rivas v. City of Passaic, 365 F.3d 181, 196 n.10 (3d Cir. 2004)).

Montanez argues that we should dismiss this interlocutory appeal for lack of jurisdiction because the appeal does not raise a pure question of law, but rather is a challenge to the District Court's factual determination that the record evidence presented at summary judgment sufficiently raised a genuine dispute. This argument seems to be based on the District Court's holding that the parties' differently-computed final release dates for the disputed term of imprisonment presented "a factual question" that prevented the entry of summary judgment. Montanez suggests that we would not be able to review this holding to the extent it indicates that the District Court found sufficient record factual support for his proffered calculation. Thompson disputes this contention, arguing that this appeal does not raise evidence sufficiency issues because an inmate's release date is a mixed question of fact and law. Thompson further points out that, in denying summary judgment, the District Court identified the applicable historical facts, including Montanez's convictions, incarceration time, and parole history, and they have not been challenged on this appeal.

Though we will briefly examine Montanez's claim that he was held beyond his maximum release date as an aid to our analysis, we do not need to finally determine the claim to resolve this appeal. We can determine whether Thompson is entitled to qualified immunity under the "clearly established" prong of Saucier v. Katz, 533 U.S. 194 (2001). As Montanez concedes, we clearly do have appellate jurisdiction over this issue. (*Amicus* Br. at 16 n.3.) We may therefore properly exercise jurisdiction over this appeal to determine whether the set of facts identified by the District Court was sufficient to establish a violation of a clearly established right. See Reilly, 532 F.3d at 224.

### B. Qualified Immunity

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Pearson v. Callahan, 129 S.Ct. 808, 815 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). Qualified immunity applies regardless of whether the government official's conduct results from a mistake of law, mistake of fact, or mistake based on mixed questions of law and fact. Id. In Saucier, the Supreme Court provided a sequential two-step inquiry for analyzing claims of qualified immunity:

> First, a court must decide whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional right. Second, if the plaintiff has satisfied this first step, the court must decide whether the right at issue was clearly established at the time of a defendant's alleged misconduct.

12

> Qualified immunity is applicable unless the official's conduct violated a clearly established constitutional right.

Pearson, 129 S.Ct. at 815-16 (citing Saucier, 533 U.S. at 201 (2001)) (internal citations and quotations omitted). Recently, however, the Supreme Court has eliminated the requirement that Saucier's two steps be analyzed in sequential order:

> On reconsidering the procedure required in Saucier, we conclude that, while the sequence set forth there is often appropriate, it should no longer be regarded as mandatory. The judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.

Id. at 818.

In this case, the parties focus on the first prong of Saucier in analyzing whether Montanez has shown that he was held beyond his maximum release date. Montanez claims that his Eighth Amendment rights were violated when his detention exceeded the maximum release date on his term of imprisonment.[4] This Court has previously held that an inmate's

---

[4] Montanez has also claimed that his term of imprisonment resulted in a violation of his due process rights under the Fourteenth Amendment. This claim was unaddressed by the District Court and has not been significantly raised by either of

13

detention beyond his or her maximum term of imprisonment could constitute cruel and unusual punishment in violation of the Eighth Amendment. See Sample v. Diecks, 885 F.2d 1099, 1107-08 (3d Cir. 1989). Thompson argues that Montanez has not shown a viable constitutional deprivation because the undisputed historical facts about Montanez's conviction and incarceration history reveal that he was not subjected to unjustified incarceration. Montanez claims that he has shown a genuine dispute of fact on this issue that would preclude summary judgment.

Considering the facts adopted by the District Court, it would seem unlikely that Montanez could show he was held beyond his maximum release date under these circumstances. The Pennsylvania parole statute provides that parole violators are to be recommitted for the remainder of their original sentence; a technical parole violator may be "reentered to serve the remainder of the original sentence or sentences. . . . from the date the parolee is taken into custody on the warrant of the board." 61 Pa. Con. Stat. Ann. § 6138(c). It is true, as Montanez points out, that he was ultimately recommitted for only six months of backtime for technical violation of his parole on the Quinones Sentence because the board rescinded its finding that he was a convicted parole violator. Despite this, he was not necessarily entitled to be released after his six-month backtime sentence had expired. In Pennsylvania, backtime is considered to be a new minimum sentence, which only affects a parole violator's entitlement to

the parties on appeal. Accordingly, we will remand to the District Court to review this claim in accordance with Forbes v. Twp. of Lower Merion, 313 F.3d 144, 149-50 (3d Cir. 2002).

14

seek reparole. See Riverbark v. Com., Pennsylvania Bd. of Prob. and Parole, 501 A.2d 1110, 1113 n.4 (Pa. 1985) ("The period of recommitment set by the Board, which may be less than the unexpired term of the parolee's sentence, simply establishes a new parole eligibility date for the parolee—*it does not entitle him to release after that period of time*. Upon completion of this period of backtime, the parolee has the right to again apply for parole and have his application considered by the Board.") (emphasis added). Additionally, Montanez contends that he received no credit for the time-period between his arrest on the new charges and eventual sentencing by Judge Smith. However, the maximum release date for the five-year Quinones Sentence was July 23, 1997, which is the date the case was closed by the final Parole Board order on that matter. Accordingly, every day between the date the Quinones Sentence was imposed (July 23, 1992) and the Quinones case closing (July 23, 1997) was fully credited towards that five-year sentence, which appears to be a correct application of Pennsylvania law. See Martin v. Pennsylvania Bd. of Prob. and Parole, 840 A.2d 299, 309 (Pa. 2003) ("[W]e hold that, where an offender is incarcerated on both a Board detainer and new criminal charges, all time spent in confinement must be credited to either the new sentence or the original sentence.").

As is clear from this discussion, however, the issue of whether Montanez was held beyond his maximum release date without penological justification turns on interpretation of Pennsylvania sentencing and probation law. Even before Pearson, we found that such cases are more appropriately resolved first under Saucier's "clearly established" inquiry. See Egolf v. Witmer, 526 F.3d 104, 110 (3d Cir. 2008) ("We agree that, in cases such as this, federal courts do a disservice to state actors

15

who would be induced to rely on a ruling that might change altogether upon subsequent review by the state court."). Therefore, in light of these considerations and because we find that Thompson is entitled to qualified immunity under Saucier's clearly established analysis, we need not finally determine whether Montanez was held beyond his maximum release date.

"The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Saucier, 533 U.S. at 201 (citing Wilson v. Layne, 526 U.S. 603, 615 (1999)). Because this inquiry focuses on the official's actual situation, the analysis "must be undertaken in light of the specific context of the case, not as a broad general proposition . . . ." Id. The second prong of the qualified immunity analysis therefore "turns on the 'objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken.'" Pearson, 129 S.Ct. at 822 (quoting Wilson, 526 U.S. at 614). "[I]f the law did not put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate." Bayer v. Monroe County Children and Youth Serv., 577 F.3d 186, 193 (3d Cir. 2009) (quoting Saucier, 533 U.S. at 202). Accordingly, qualified immunity analysis "gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." Egolf, 526 F.3d at 110-11 (quoting Gilles v. Davis, 427 F.3d 197, 203 (3d Cir. 2005)); see also Malley v. Briggs, 475 U.S. 335, 341 (1986).

16

We begin this analysis by reviewing the established legal rules during the relevant time period. In the context of an Eighth Amendment claim for incarceration without penological justification, this Court has held that a plaintiff must demonstrate three elements to establish § 1983 liability against a prison official: (1) a prison official had knowledge of the prisoner's problem and thus of the risk that unwarranted punishment was being, or would be, inflicted; (2) the official either failed to act or took only ineffectual action under the circumstances, indicating that his response to the problem was a product of deliberate indifference to the prisoner's plight; and (3) a causal connection between the official's response to the problem and the unjustified detention. Sample, 885 F.2d at 1110. Relevant circumstances in assessing these factors are the scope of the official's duties and the role the official played in the life of the prison. Id. In Sample, we found an Eighth Amendment violation where the record demonstrated that Diecks (the prison official):

> (1) believed Sample's inquiry might well have merit, (2) knew that the matter needed to be clarified, (3) believed Sample had to rely on his (Diecks') efforts alone to rectify the problem, (4) did not follow the relevant procedures mandated by the Pennsylvania Bureau of Correction, (5) took no other remedial action, and (6) did not inform Sample of any other action he (Sample) might take to resolve his problem.

Id. at 1111. The Sample articulation of this legal standard was reaffirmed in Moore v. Tartler, 986 F.2d 682, 686 (3d Cir. 1993). In Moore, parole officials initially misinterpreted a judge's

17

sentencing order resulting in a six-month delay of Moore's release. Id. at 683-684. The officials denied Moore's initial requests for release, but did launch an investigation of his claims that lasted over five months and eventually resulted in his release. Id. We noted that deliberate indifference was more typically shown "in those cases where prison officials were put on notice and then simply refused to investigate a prisoner's claim of sentence miscalculation." Id. at 686. Expanding on this proposition, we highlighted Haygood v. Younger, 769 F.2d 1350 (9th Cir. 1985), and Alexander v. Perrill, 916 F.2d 1392 (9th Cir. 1990), two pertinent cases decided by the Ninth Circuit:

> In *Haygood* the prisoner was incarcerated almost five years beyond his lawful term as a result of prison officials' failure to investigate. Because prison officials failed to address Haygood's credible evidence that he was entitled to release, the Court of Appeals for the Ninth Circuit concluded that the prison officials were deliberately indifferent to Haygood's constitutional rights. Similarly, in *Alexander v. Perrill*, a prisoner presented credible evidence that prison officials, after being put on notice, simply refused to investigate a computational error. There prison officials "stood idly by after an inmate raised the proposition that he was being unlawfully incarcerated and had provided documentary evidence in support of his claim."

Moore, 986 F.2d at 686. Noting the undisputed facts showed that the Parole Board did not ignore Moore's complaint or

18

operate outside standard operating procedures, we declined to find that the Parole Board's investigation of Moore's claims, though taking five months, was inept or ineffectual such that it could constitute deliberate indifference. Id. at 687.

In this case, the District Court found that the evidence was sufficient to show Montanez communicated with Thompson at least twice and maybe three times during his incarceration. Though not referenced in its opinion, presumably the District Court was referring to the two inmate request forms sent by Montanez to the prison record office. Montanez submitted the first communication on October 10, 1998, in which he requested copies of his commitment papers. (App. at 90.) He noted in the request that he needed the commitment papers to write the "Clerk of Courts" to fix his detainer. (Id.) Within three days, Thompson responded and informed Montanez that the Department of Corrections required $.10 for each copy of commitment papers requested by an inmate and instructed him to submit a cash slip so that she could process his request. (Id.) Montanez was thereafter transferred to Philadelphia County Prison, and Thompson herself had no further contact with Montanez until 2001 when he returned to SCI Albion. At that point, on May 22, 2001, he submitted another inmate request form, referencing the commitment credit issue and asking if Judge Smith had responded to Thompson's letter about the subject. Thompson again responded within three days, explaining the progress on Montanez's inquiry:

> In answer to the your first question regarding Commit. Credit, we sent the letter to Judge Smith on 2-8-01, not 4-16-01, that was the last time I sent

19

you correspondence. Until I hear from the Judge, I cannot give you credit per DOC policy, it is not appropriate to give pre-commitment credit for time being served in satisfaction of a separate and distinct sentence.

(App. at 91.) The District Court did not identify any other communication between Thompson and Montanez. At her deposition, Thompson explained that in investigating Montanez's claim, she reviewed his file with her local supervisor in accordance with standard DOC policy and determined there was a viable question with regard to his proper commitment credit. (App. at 105.) Thompson and her supervisor therefore involved DOC's main records supervisor and its legal counsel at the central DOC office. This process resulted in Montanez receiving commitment credit for the period of incarceration before the Smith Sentencing. After applying this credit, Montanez's revised sentence calculation placed him beyond his maximum incarceration date. Therefore, Montanez was immediately released on December 15, 2001.

Considering the legal rules, which were well established at the relevant time, in light of the facts and circumstances of this case as recounted above, it was objectively reasonable for Thompson to have believed that her particular conduct in this case was lawful and in keeping with Montanez's constitutional rights. There are no facts in the record, either identified by the District Court or found by our own review, suggesting that Thompson ignored Montanez's claims or even failed to follow established DOC policy during her involvement with the investigation of Montanez's claims. In both of Thompson's

recorded exchanges with Montanez, she responded quickly and related material information back to Montanez. It is clear from her second exchange and Montanez's subsequent release that she took Montanez's claims seriously: she forwarded the commitment credit issue to the appropriate parties for review, including her supervisor, the sentencing judge, and even DOC's central office and legal department. The process did take a significant amount of time to resolve, but Montanez's claim for commitment credit did not involve simple determinations, which is demonstrated by the parties' extensive briefing on this issue and our own discussion above. As *amicus* argues on behalf of Montanez, his release date was "complicated by multiple convictions, parole, parole violations, 'backtime,' and vacated sentences." (*Amicus* Br. at 20.) Additionally, the District Court did not identify any facts that would suggest Thompson's actions were in any way responsible for the delay in releasing Montanez. Accordingly, we do not believe the established law in this case would have put Thompson on notice that her conduct was clearly unlawful; summary judgment based on qualified immunity is appropriate.

## IV. CONCLUSION

For the foregoing reasons, Appellant Thompson is entitled to qualified immunity with respect to Montanez's Eighth Amendment claims. Accordingly, we will reverse the District Court's denial of summary judgment on this issue and remand for proceedings consistent with this opinion.