NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 14-3420
_____

BRYAN E. FISCHER,
                                        Appellant

v.

G4S SECURE SOLUTIONS USA, INC.
_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 10-cv-6792)
District Judge:  Hon. Jerome B. Simandle
_____

Submitted Under Third Circuit L.A.R. 34.1(a)
June 5, 2015

Before:   FISHER, JORDAN, and SHWARTZ, *Circuit Judges*.

(Filed June 8, 2015)
_____

OPINION*
_____

JORDAN, *Circuit Judge*.

Appellant Bryan Fischer asks us to reverse an order of the United States District

Court for the District of New Jersey granting summary judgment in favor of his former

---

* This disposition is not an opinion of the full Court and, pursuant to I.O.P. 5.7, does not constitute binding precedent.

employer G4S Secure Solutions USA, Inc. ("G4S"), on his New Jersey Conscientious Employee Protection Act ("CEPA") claim. N.J. Stat. Ann. 34:19-1, *et seq.* Because Fischer has failed to adduce evidence of a causal link between what he claims was protected whistle-blowing and his termination, we will affirm.

## I. Background[1]

### A. Factual Background

G4S hired Fischer in 2007 to be an armed security officer at the Salem-Hope Creek nuclear power facility for which G4S provides security services under a contract with PSEG Nuclear, LLC ("PSEG"). While there, Fischer joined a security officers' union. During his tenure, he received training materials and attended numerous training sessions on safety, ethics, misconduct, and harassment in the workplace.

Between April 2008 and February 2010, Fischer reported three "safety concerns" to PSEG, provoking unfavorable responses from his co-workers. The first incident occurred in April 2008 when a manager in PSEG's security department asked Fischer if he was aware of any unauthorized chairs on site in which security officers might sit without permission and he told the manager that there was a chair that was used to prop open the roof door. At the manager's direction, Fischer and a co-worker removed the chair.[2]

_____

[1] These facts are recounted in the light most favorable to Fischer, the non-movant. *See infra* n.4.

[2] On April 17, 2008, a co-worker kicked the back legs of Fischer's chair. Fischer thought this was in retaliation for his report about the chair, and he complained about the

2

The second incident occurred one year later when Fischer discovered that a visitor to the facility had a digital camera without a "camera pass" authorizing the carrying of a camera into a protected area of the facility. Fischer believed that a co-worker, security officer Glasby, who had allowed the visitor to enter without a camera pass, had violated security protocol, prompting Fischer to tell the security team leader on duty. Several days later, Glasby confronted Fischer and asked: "What are you trying to [do,] jam me up?" (App. at 184.)

The third incident occurred on February 14, 2010, when Fischer smelled alcohol on the breath of another co-worker, security officer Crowell, and inquired whether Crowell had been drinking. Crowell replied that he had had some drinks the night before but felt fine. Fischer believed that security officers were required to self-report if they were intoxicated or if they had been under the influence of alcohol within five hours of reporting for duty, and Fischer instructed Crowell to do so. Fischer then informed Terry Snyder, the union's vice president, about the situation, and they both accompanied Crowell to the locker room to take a fitness-for-duty breathalyzer test. Crowell failed the test and was terminated that same day.

Some of Fischer's co-workers expressed dissatisfaction with his behavior and Crowell's termination. For example, one showed him text messages that read, "Fischer is going to get his," and "Fischer's no good, why you talk to him?" (App. at 108.) Another officer told Fischer that "he needed to stop reporting things" and that, if they were in the

incident. A union representative facilitated an apology from the co-worker, which Fischer accepted.

3

military, other officers "would pay him a visit at night." (*Id.*) Fischer testified during his deposition that, when he entered the security officers' break room, some union officers would leave the room. Fischer discussed with Snyder the possibility of contacting PSEG's Employee Concerns Program about this treatment by his co-workers. The next day, the union president, Anthony Rizzo, said, "I hear you're going to contact Employee Concerns. … Go ahead and contact Employee Concerns and see where that gets you." (App. at 194.)

After Fischer contacted the manager of the Employee Concerns Program, Mike Headrick, Headrick called Fischer's supervisor who, over the radio, relayed the message for Fischer to call "extension 2014," the import of which Fischer feared his coworkers would recognize. Headrick later apologized for calling the supervisor, and arranged to meet Fischer that evening to discuss the work environment. Fischer met with Headrick twice and reported that his coworkers were treating him differently, prompting Headrick to tell him that he would investigate the matter and keep him apprised of any updates. Fischer also arranged meetings with Hunter Sawders, the project manager for G4S, and Brian Jacques, the PSEG security manager. Jacques suggested that Fischer be assigned to administrative work in the administration building, to separate him from his fellow union officers while the situation was under review. Although Fischer reported to work in the administration building at least twice, the union protested that its collective bargaining agreement did not allow officers to perform such work. Consequently, on May 24, 2010, Fischer was placed on administrative leave with pay, pending an investigation.

G4S retained an attorney, Arthur Domby, to investigate Fischer's concerns. Domby spoke with Fischer several times throughout the investigation, and, as the investigation drew to a close in July 2010, Domby told Fischer that he believed the work environment was being corrected. Domby further reported that any disciplinary action against union co-workers would be up to Sawders and G4S. In August 2010, Fischer contacted a field examiner at the National Labor Relations Board ("NLRB") office in Philadelphia about filing unfair labor practice charges against the union and G4S. The field examiner drafted charges, but Fischer ultimately decided not to sign or file them. Fischer maintains that he told members of G4S management, including Sawders, that he was considering filing NLRB charges, but G4S contends that, because he never actually did so, neither G4S nor the union ever received notice.

In September 2010, Fischer had a series of telephone conversations and in-person meetings with management of G4S and PSEG about whether and how he could return to work, all of which he surreptitiously recorded. In the conversations, management reassured Fischer that they were taking his concerns seriously and that they would take action against anyone who gave him trouble. Specifically, management informed Fischer – repeatedly – that it would have a "zero tolerance" policy on any harassment or bullying directed toward him. (*See, e.g.*, App. at 226 (deposition testimony from Fischer in which he admits he was told there would be "zero tolerance" of harassment); App. at 440 ("Zero tolerance. For this case in particular, ... zero tolerance. Number one, I will not tolerate anybody giving you shit out there, period."); App. at 456 ("I told you ... I'm an advocate. I'm your advocate. Somebody is out there giving you a hard time, you call me. All

5

right?  ...  And I will call the president and we'll call him and we'll say you're done.  Get him off-site.  Not – not you, but whoever is giving you a hard time.  Because we have zero tolerance for that.").)  Management also informed Fischer that they were glad he had reported the misconduct and that he had done "exactly what everybody should [do]." (App. at 446.)  They informed him that things would "be different" and that they would not tolerate any "union games."  (*Id.*)  Management also informed Fischer that he should "continue to identify and raise issues.  … [W]e welcome that, and … we want to make sure that that doesn't stop."  (App. at 463.)  Management also told Fischer he would have a direct line to them and that he should immediately contact them if anyone were to give him a "hard time," and they further emphasized that they were his "advocate[s]."  (App. at 456.)

When Fischer indicated that he felt he would be unsafe if he returned to work, management asked him what measures would make him feel safe and offered to take a number of steps, including providing him with an escort, to ensure his "safety and smooth transition."  (App. at 524.)  Management told Fischer that his "health and safety is our most important priority right now."  (App. at 484.)  When Fischer suggested that a transfer to a different facility might make him feel more comfortable (App. at 475-476), management offered to transfer him to New Hampshire, which would cause him to lose three years of union seniority, but he refused because his wife apparently does not "like cold climates,"  (App. at 506; *see also id.* at 505 ("[M]y wife's not going to move."); *id.* at 506 ("[S]he told me, if she was going anywhere, it's south.")).  Management asked about

6

firing the offending officers, but Fischer believed that doing so would only lead to increased hostility among the remaining employees.

On September 24, 2010, Fischer's attorney sent G4S a letter rejecting the offer to transfer and demanding a severance package of $800,000. G4S rejected that severance demand the same day, and instructed Fischer to contact management no later than September 27 to return to work or pursue the transfer. On September 29, Fischer's attorney sent G4S a letter indicating that Fischer would not be returning to work. On October 8, G4S sent Fischer a letter informing him that he was terminated for failing to report to work.

## B.    Procedural History

On November 16, 2010, Fischer filed a complaint against G4S in New Jersey state court and, in late December, G4S removed the action to federal court, based on federal question jurisdiction. G4S successfully moved to the claims against it. Fischer later filed an amended complaint asserting a single claim for retaliation under New Jersey's CEPA, arguing that he was terminated for "speaking out or threatening to speak out about [G4S]'s inability or unwillingness to follow safety requirements ... and for speaking out or threatening to speak out about unfair labor practices to the National Labor Relations Board." (App. at 75 ¶ 38.) After discovery closed, G4S moved for summary judgment and the District Court granted that motion in June 2014.[3] Fischer timely appealed.

---

[3] The District Court concluded that, because G4S's motion for summary judgment sought dismissal of the CEPA claim insofar as it was based on the unfiled NLRB charges and because Fischer did not address the NLRB charges at all in opposing summary judgment, Fischer had abandoned any argument rooted in those unfiled charges. We

7

## II.    Discussion[4]

CEPA protects employees from retaliation by employers for reporting suspected violations of law or public policy. *Battaglia v. United Parcel Serv., Inc.*, 70 A.3d 602, 625 (N.J. 2013). To survive a summary judgment motion, a plaintiff bringing a CEPA claim must establish a prima facie case by demonstrating that "(1) he reasonably believed that his employer's conduct was violating a law or rule or regulation promulgated pursuant to law, (2) he objected to the conduct, (3) an adverse employment action was taken against him, and (4) a causal connection exists between the whistleblowing activity and the adverse employment action." *Sarnowski v. Air Brooke Limousine, Inc.*, 510 F.3d 398, 404 (3d Cir. 2007).

---

agree. "It is a well-settled rule that a party opposing a summary judgment motion must inform the trial judge of the reasons, legal or factual, why summary judgment should not be entered. If it does not do so, and loses the motion, it cannot raise such reasons on appeal." *Liberles v. Cnty. of Cook*, 709 F.2d 1122, 1126 (7th Cir. 1983); *accord Grenier v. Cyanamid Plastics, Inc.*, 70 F.3d 667, 678 (1st Cir. 1995) ("If a party fails to assert a legal reason why summary judgment should not be granted, that ground is waived and cannot be considered or raised on appeal." (internal quotation marks omitted)); *Aslanidis v. U.S. Lines, Inc.*, 7 F.3d 1067, 1077 (2d Cir. 1993) ("[A] party opposing summary disposition of a case must raise all arguments against such remedy in the trial court and may not raise them for the first time on appeal."); *cf. Shell Petroleum, Inc. v. United States*, 182 F.3d 212, 218 (3d Cir. 1999) (stating that, in order for an issue to be preserved for appeal, a litigant "must unequivocally put its position before the trial court at a point and in a manner that permits the court to consider its merits").

[4] The District Court had jurisdiction under 28 U.S.C. §§ 1332 and 1441. We have jurisdiction pursuant to 28 U.S.C. § 1291. We review the District Court's grant of summary judgment de novo and "view inferences to be drawn from the underlying facts in the light most favorable to the nonmoving party." *Montanez v. Thompson*, 603 F.3d 243, 248 (3d Cir. 2010) (internal quotation marks omitted). Summary judgment is appropriate if we are satisfied that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

Here, the District Court concluded that Fischer's disclosures about the chair and the camera were not protected because he could not point to a "law, rule, regulation, or clear mandate of public policy" that bore a substantial nexus to the disclosures. *Hitesman v. Bridgeway, Inc.*, 93 A.3d 306, 320 (N.J. 2014) ("[T]he plaintiff must identify the authority that provides a standard against which the conduct of the defendant may be measured."). Fischer did not identify at summary judgment any statute, rule, or public policy related to camera passes, and he did not attempt to explain how having an "unauthorized" chair violated the law as opposed to union rules or company policy. *Cf. Dzwonar v. McDevitt*, 828 A.2d 893, 904 (N.J. 2003) (stating that the trial court should have precluded CEPA claim based on violation of union rules because "bylaws are not a law, rule or regulation pursuant to CEPA" (internal quotation marks omitted)). On appeal, Fischer argues that the District Court's ruling was in error but he still fails to explain how either disclosure constituted a violation of a statute, rule, or public policy. Instead, he argues that, because those disclosures had the potential to create a hostile working environment if his coworkers actually did retaliate against him and because a violent working environment would be dangerous at a nuclear facility, the disclosures are protected.[5] He misapprehends the law; the disclosure itself must bear a substantial nexus to a law, rule, regulation, or clear mandate of public policy and he does not even attempt to argue that such is the case here. *Id.*; *Hitesman*, 93 A.3d at 320. Accordingly, the

---

[5] Insofar as Fischer attempts to raise for the first time on appeal a claim based on reporting a hostile work environment, he may not do so.

District Court did not err in concluding that the claims related to the chair and the camera pass could not survive.

Even if we were to conclude that those rulings were in error, however, Fischer's claims based on them would still fail for the same reason that his claim based on the report of his intoxicated co-worker fails: there is no causal connection between the disclosures and his termination.[6] Fischer was fired because he refused to come to work after his employer repeatedly assured him that it would take a number of measures to protect him and that harassment or bullying directed at him would not be tolerated. Contrary to Fischer's assertions that this justification was a mere pretext and that G4S was angry with him for "making waves" (Opening Br. at 24), the undisputed evidence, including recordings that Fischer himself created, shows that G4S was indeed very supportive of Fischer's disclosures. The company commended Fischer for making the disclosures, held him out as a model employee, and took a number of steps to facilitate his reintegration at the PSEG facility.

Based on the record before us, no rational juror could conclude that G4S had constructively terminated Fischer by refusing to address his concerns about retaliation, or that G4S had fired Fischer because it was unhappy that he reported workplace violations. Accordingly, the District Court did not err in granting summary judgment for the company.

---

[6] The parties agree that termination is an adverse employment action under CEPA but disagree as to whether Fischer's termination is causally connected to his disclosures. The District Court only reached whether the disclosure based on the intoxicated co-worker was causally connected to Fischer's discharge, because it had already concluded that the other two disclosures were not protected by CEPA.

## III.    Conclusion

For the forgoing reasons we will affirm the ruling of the District Court.