PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 09-3753

_____

ERIC M BETTS; SUSAN BETTS,
Appellants

v.

NEW CASTLE YOUTH DEVELOPMENT CENTER;
KENNETH WENT, in his individual and official capacity;
CHARLES MITCHAM, in his individual and official
capacity; DAVID TOMOCHECK, in his individual and
official capacity; OMAR STUART, in his individual and
official capacity; WILLIE BLUE, in his individual and
official capacity; TAMMY A ODEM, in her individual and
official capacity; JOHN DOE, in his individual and official
capacity

_____

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. No. 07-cv-00337)
District Judge: Honorable David Stewart Cercone

_____

Argued May 18, 2010
Before: FUENTES, HARDIMAN and
NYGAARD, *Circuit Judges*.

(Filed: September 13, 2010)

Robert Ross [Argued]
Ross, Fuller & Casey
1650 Market Street
One Liberty Place, Suite 3450
Philadelphia, PA 19103
        *Attorneys for Appellants*

John G. Knorr, III [Argued]
Office of Attorney General of Pennsylvania
Strawberry Square
Harrisburg, PA 17120-0000

Mary L. Friedline
Mariah Passarelli
Office of Attorney General of Pennsylvania
564 Forbes Avenue
Manor Complex
Pittsburgh, PA 15219-0000
        *Attorneys for Appellees*

———

OPINION OF THE COURT

———

HARDIMAN, *Circuit Judge*.

On Saturday, April 29, 2006, seventeen-year-old Eric Betts suffered a tragic spinal cord injury while attempting to make a tackle during a "pick-up" football game at the New Castle Youth Development Center (YDC). Following the injury, Betts sued YDC and several of its staff members pursuant to 42 U.S.C. § 1983, claiming various constitutional violations. The District Court entered summary judgment for YDC and its staff in their official capacities, finding them immune from suit under the Eleventh Amendment. Summary judgment also was entered on the merits in favor of the Defendants in their individual capacities. Betts filed this timely appeal.[1]

I.

The District Court had subject matter jurisdiction pursuant to 28 U.S.C. § 1331. We have appellate jurisdiction under 28 U.S.C. § 1291.

"Our review of Defendants' entitlement to Eleventh Amendment immunity is plenary." *Haybarger v. Lawrence County Adult Prob. and Parole*, 551 F.3d 193, 197 (3d Cir.

---

[1] Because Betts was a minor at the time of the injury, his mother brought suit as well, seeking compensation for the medical expenses she incurred on behalf of her son. Because there is complete overlap between the claims of Betts and his mother, for the sake of convenience we refer only to Betts.

2008). We review the District Court's summary judgment de novo, viewing the facts in the light most favorable to the nonmoving party. *See Groman v. Twp. of Manalapan*, 47 F.3d 628, 633 (3d Cir. 1995). Summary judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c)(2). A genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When the moving party has carried its burden, the nonmoving party must "set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2). Unsupported assertions, conclusory allegations, or mere suspicions are insufficient to overcome a motion for summary judgment. *See Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3d Cir. 1989).

II.

The YDC houses youths who have been adjudicated delinquent and committed by Pennsylvania's Juvenile Courts to the care and custody of the Pennsylvania Department of Welfare's Bureau of Juvenile Justice Services. At the time of his injury, Betts had been committed to the YDC's Secure Treatment Program—a maximum security program for serious offenders—and was assigned to one of five residential cottages. Counselors worked in the cottages and were required to accompany the residents at all times. On weekends, residents had "free time" during which they were permitted to use indoor and outdoor basketball courts, several gyms and weight training equipment, a swimming pool, and an outdoor area available for

4

football or walking. During daytime activities such as the football game involved in this case, at least one YDC staff member had to be present for every six residents.

On the day Betts was tragically injured, two counselors accompanied ten residents, including Betts, to the outdoor area to play football. By their previous agreement, residents from Pittsburgh chose to square off against residents from Philadelphia. As was their habit, the residents played tackle football without any equipment. During the course of the fateful game, a player simulated a kickoff by throwing the ball into the air. Betts—who had prior experience playing organized and "pick-up" tackle and touch football—ran down the field "full force" and hit the ball carrier with his head. Betts testified at his deposition that he "really tried to hurt" the opposing player because his "adrenaline was rushing."

Upon impact, Betts fell to the ground and was unable to get up. While Betts was lying on the ground, a counselor advised Betts to tell people he had been playing touch, not tackle, football.[2] An ambulance transported Betts to a local hospital, where he was evacuated by helicopter to St. Elizabeth's Hospital in Youngstown, Ohio. Unfortunately, Betts's spinal cord injury was so severe that it resulted in quadriplegia.

---

[2] Betts testified that the residents always played tackle football, "physical, full contact like the Steelers." Although some YDC staff testified that the games were touch football, we accept the truth of Betts's version of events for purposes of this appeal.

Following the accident, Betts sued YDC and several of its staff members in their official and individual capacities. As relevant to this appeal, Betts claimed his rights were violated under the Eighth and Fourteenth Amendments to the United States Constitution. The Defendants filed a motion for summary judgment, asserting that YDC and its staff in their official capacities were immune from suit under the Eleventh Amendment. The District Court agreed, holding that the Pennsylvania Department of Public Welfare (DPW) is an administrative agency without existence apart from the Commonwealth. *Betts v. New Castle Youth Dev. Ctr.*, 2009 WL 2913846, at *3 (W.D. Pa. Sept. 8, 2009). And because the YDC is a Pennsylvania state agency "regulated, monitored and maintained" by the DPW, it was entitled to the same immunity. *Id*.[3]

As for Betts's individual-capacity claims against the YDC staff members, the District Court ruled on the merits. On Betts's Eighth Amendment claim, the District Court held there was insufficient evidence to raise genuine issues of fact as to the existence of a substantial risk of serious harm and the Defendants' deliberate indifference to that risk. *Id*. at *5-6. Regarding Betts's claims under the Due Process Clause of the Fourteenth Amendment, the District Court held that his claim for deliberate indifference failed for the same reason it failed

---

[3] The District Court also dismissed Betts's claims under the Fourth and Fifth Amendments to the United States Constitution, but Betts has not preserved those claims for appeal.

under the Eighth Amendment and that there was no liability under the state-created danger doctrine because the challenged behavior did not shock the conscience. *Id*. at \*6-8.

## III.

State governments and their subsidiary units are immune from suit in federal court under the Eleventh Amendment, which provides: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."[4] U.S. Const. amend. XI. "The Supreme Court extended the Eleventh Amendment's reach to suits by in-state plaintiffs, thus barring all suits against non-consenting States in federal court." *Lombardo v. Pennsylvania Dep't of Public Welfare*, 540 F.3d 190, 194 (3d Cir. 2008) (citing *Hans v. Louisiana*, 134 U.S. 1 (1890)). Individual state employees sued in their official capacity are also entitled to Eleventh Amendment immunity

---

[4] The Supreme Court has explained—and we have recognized—that "'the Eleventh Amendment does not define the scope of the States' sovereign immunity; it is but one particular exemplification of that immunity.'" *Lombardo v. Pennsylvania Dep't of Public Welfare*, 540 F.3d 190, 195 (3d Cir. 2008) (quoting *Federal Mar. Comm'n v. S.C. State Ports Auth.*, 535 U.S. 743, 753 (2002)). Thus, the States' sovereign immunity "extends beyond the literal text of the Eleventh Amendment" to comprise more than just immunity from suit in federal court, but also "immunity from liability." *Id*.

7

because "official-capacity suits generally represent only another way of pleading an action" against the state. *Hafer v. Melo*, 502 U.S. 21, 25 (1991) (internal quotation marks omitted). However, "[t]he Supreme Court has long held that counties, municipalities, and political subdivisions of a state are not protected by the Eleventh Amendment." *Febres v. Camden Bd. of Educ.*, 445 F.3d 227, 229 (3d Cir. 2006) (citations omitted). The party asserting Eleventh Amendment immunity "bears the burden of proving its applicability." *Christy v. Pennsylvania Tpk. Comm'n*, 54 F.3d 1140, 1144 (3d Cir. 1995).[5]

"[I]n certain instances summary disposition of the eleventh amendment issue is possible," however, in close cases, "evidence beyond the mere statutory language is required." *Blake v. Kline*, 612 F.2d 718, 726 (3d Cir. 1979). When evidence beyond mere statutory language is required, we apply an "oft-reiterated" three-part test to determine "whether an entity is an 'alter ego' or 'arm' of a state for purposes of Eleventh Amendment immunity." *Christy*, 54 F.3d at 1144 (collecting cases). In this case, the District Court did not apply the *Christy* test because it found dispositive the relevant statutory language and Betts's concessions concerning DPW's control of YDC. Betts claims the District Court erred by failing to apply the *Christy* test. We disagree with Betts and, in doing so, endeavor to clarify when the *Christy* test should and should not be applied.

---

[5] The Commonwealth of Pennsylvania has not waived its rights under the Eleventh Amendment in this case. *See* 42 PA. CONS. STAT. § 8521(b).

8

The fundamental flaw in Betts's argument lies in its fallacious premise, *viz.*, that this is a case where "evidence beyond mere statutory language" is required. As we stated long before *Christy* was decided: "in certain instances summary disposition of the eleventh amendment issue is possible . . . ." *Blake*, 612 F.2d at 726; *see also Christy*, 54 F.3d at 1144 ("In general, a claim of Eleventh Amendment immunity will occasion serious dispute only where a relatively complex institutional arrangement makes it unclear whether a given entity ought to be treated as an arm of the state." (citation omitted)). We agree with the District Court that this case is one where summary disposition is not only possible, but appropriate.

As the District Court duly noted, Pennsylvania and federal law establish that the DPW is entitled to Eleventh Amendment immunity because it is an administrative agency without existence apart from the Commonwealth. *See* 71 PA. CONS. STAT. § 61 ("executive and administrative work of [the Commonwealth of Pennsylvania] shall be performed by" various executives and administrative agencies, including the "Department of Public Welfare"); *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 108 n.16 (1984) (holding that defendants including Pennsylvania DPW, and Pennhurst State School and Hospital—"a state institution"—were entitled to immunity under the Eleventh Amendment); *Lavia v. Pennsylvania Dep't of Corrections*, 224 F.3d 190, 195 (3d Cir. 2000) ("Because the Commonwealth of Pennsylvania's Department of Corrections is a part of the executive department of the Commonwealth, *see* Pa. Stat. Ann., tit. 71, § 61, it shares in the Commonwealth's Eleventh Amendment immunity."); *Lombardo*, 540 F.3d at 193. As Betts conceded in the trial

9

court, YDC is a Pennsylvania state agency "regulated, monitored and maintained by the [DPW]." *Betts*, 2009 WL 2913846, at \*3 (citing the complaint); *see also Beers-Capitol v. Whetzel*, 256 F.3d 120, 124-25 (3d Cir. 2001) (noting that YDC is "a detention facility for juveniles run by the Pennsylvania Department of Public Welfare"). Accordingly, the District Court concluded that YDC was entitled to the same immunity as the DPW.

The District Court's holding is firmly grounded in Pennsylvania statutory law, which provides:

> "State institutions" means and includes all hospitals for the mentally ill or any other institutions for mentally retarded or epileptic persons, or for juvenile delinquents and dependents, and charitable institutions, within this Commonwealth, maintained in whole by the Commonwealth, and whose boards of trustees are departmental administrative boards within the department.

62 PA. CONS. STAT. § 301. The DPW has "supervision over all State institutions," *id*. at § 302, and Pennsylvania's statutory scheme for DPW administration of these institutions further evidences that YDC does not have independent status apart from the Commonwealth. *See Id*. at §§ 304 (payment of costs), 305 (DPW control over contracts for repairs, alterations or equipment), 307 (DPW control over contracts for utility services); 308 (DPW authority to lease land at state institutions to municipalities for purposes of garbage disposal); 342 (DPW

10

power to appoint superintendents of state institutions). This statutory scheme—which explicitly includes institutions for juvenile delinquents within the definition of "state institutions"—is the beginning and the end of the matter for purposes of Eleventh Amendment immunity. This is not a case involving complex institutional arrangements with non-state actors.[6]

In sum, because Pennsylvania law provides, and Betts concedes, that institutions for juvenile delinquents are state institutions existing within the Department of Public Welfare and YDC was, in fact, managed by DPW, we hold that the District Court did not err in granting Eleventh Amendment immunity to YDC and its staff in their official capacities. The District Court was not required to reflexively apply the *Christy* test because YDC is clearly an arm of the Commonwealth under state law.

---

[6] That YDC did not have a Board of Trustees in place for at least two years prior to the time of Betts's accident does not negate that it is a "state institution" under § 301. By law, the Board of Trustees is a "departmental advisory board" within the DPW, 62 PA. CONS. STAT. § 301, whose primary responsibilities include making recommendations regarding the management, operations, and policy of the institution, *see id* at § 317. Like the District Court, we are not aware of any precedent or facts supporting Betts's declaration that the absence of a Board of Trustees turned the YDC into a "rogue institution operating outside the supervision of the Commonwealth." Betts Br. at 13.

11

IV.

Following its initial ruling with respect to the Eleventh Amendment, the District Court proceeded to adjudicate the merits of Betts's claims against the YDC staff[7] in their individual capacities, as required by *Hafer v. Melo*, 502 U.S. 21, 31 (1991). We turn first to Betts's Eighth Amendment claim.

Betts contends the District Court erred in entering summary judgment on his Eighth Amendment claim because he raised genuine issues of material fact as to the existence of a substantial risk of serious harm and the Defendants' deliberate indifference to that risk.

The Eighth Amendment's prohibition on "cruel and unusual punishment" restrains prison officials from certain actions (e.g., the use of excessive force against prisoners), and imposes on them a duty to provide "humane conditions of confinement." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). That is, "prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'" *Id.* (quoting *Hudson v. Palmer*, 468 U.S. 517, 526-27

---

[7] Specifically, Betts sued Kenneth Went, Director of Operations for all youth development facilities; Charles Mitcham, Director of the Secure Treatment Program at YDC; David Tomochek, a Youth Development Counselor Supervisor at YDC; Omar Stuart, a Counselor at YDC; and Willie Blue and Tammy A. Odem, Youth Development Aides at YDC.

12

(1984)).[8]  For an alleged deprivation to rise to the level of an Eighth Amendment violation, it must "result in the denial of 'the minimal civilized measure of life's necessities.'"  *Id.* at 835 (quoting *Rhodes*, 452 U.S. at 347).  To prove an Eighth Amendment violation based on a failure to ensure his reasonable safety, Betts must show that the Defendants were "deliberately indifferen[t] to a substantial risk of serious harm."  *Id.* at 828. The question of YDC's deliberate indifference is a subjective inquiry, while risk of harm is evaluated objectively.  *See Atkinson v. Taylor*, 316 F.3d 257, 262 (3d Cir. 2003).

In *Helling v. McKinney*, 509 U.S. 25 (1993), an inmate filed suit against prison officials alleging Eighth Amendment violations based on his involuntary exposure to environmental tobacco smoke (ETS) emanating from his cellmate's cigarettes. 509 U.S. at 27 (alleging cellmate smoked five packs a day).  The prison obtained a directed verdict from the district court but the court of appeals reversed in part, concluding that the lower court erred by denying Helling the opportunity to prove his allegations of unreasonable exposure to a future harm.  *Id.* at 29.

The Supreme Court affirmed the court of appeals, holding that Helling had alleged a sufficiently serious harm: involuntary exposure to levels of second-hand smoke that created an unreasonable risk of harm to future health.  *Id*. at 35.

---

[8] An allegation of an Eighth Amendment violation by a juvenile detention facility official is analyzed under the same rubric as an allegation against a prison official.  *Beers-Capitol*, 256 F.3d at 125.

13

With respect to proving the objective element of a harm rising to the level of a constitutionally serious deprivation on remand, the Supreme Court stated Helling would have to prove that he was exposed to "unreasonably high levels of ETS." *Id*. Such a showing requires "more than a scientific and statistical inquiry into the seriousness of the potential harm and the likelihood that such injury to health will actually be caused by exposure to ETS." *Id*. at 36. Objectively serious harm also requires an assessment of society's view of the risk; i.e., whether "it violates contemporary standards of decency to expose *anyone* unwillingly to such a risk." *Id*. at 36. Thus, under *Helling*, for Betts to satisfy the objective component of his claim he must establish (1) the seriousness of the injury, (2) a sufficient likelihood that serious injury will result from playing tackle football without protective equipment, and (3) the risks associated with permitting youth to play tackle football without equipment violate contemporary standards of decency. Betts easily meets the first factor, but fails the other two.

It goes without saying that quadriplegia is an exceptionally serious harm. But Betts has presented no evidence that playing tackle football without equipment poses a "substantial risk" of serious harm. Instead, Betts argues that "the risk of serious harm associated with allowing residents to play tackle football without protective equipment is sufficiently obvious that any reasonable adult would realize it." Betts Br. at 19. We disagree with Betts's assertion that the excessive nature of the risk of serious injury from football is obvious.

In support of his claim that the risk of serious harm inherent in playing tackle football without equipment is obvious,

14

Betts cites some of the Defendants' admissions at their depositions that playing football may result in serious injury. Specifically, Betts notes that Counselor Stuart admitted he was aware that New England Patriots wide receiver Darryl Stingley was paralyzed after he was speared by Jack Tatum of the Oakland Raiders during an NFL preseason game in 1978. But the fact that football players have suffered grievous injuries while playing the game sheds no light on the frequency or likelihood of such injuries. The mere possibility that an injury may result from an activity does not mean that there is a "substantial risk" of that injury occurring. *See Baze v. Rees*, 553 U.S. 35, 50 (2008) (plurality) ("an isolated mishap alone does not violate the Eighth Amendment . . . because such an event, while regrettable, does not suggest . . . a 'substantial risk' of serious harm."). While Betts submitted expert reports concluding that his injury was caused by his tackle and that cervical spine injuries have occurred in other football games, these reports offer no insight into the frequency or likelihood of such injuries.[9] *See Rish v. Johnson*, 131 F.3d 1092, 1099 (4th

---

[9] Despite the potential for serious injury, it appears such injuries occur rarely. A comprehensive report from the National Center for Catastrophic Injury Research—coauthored by one of Betts's experts—states that there are approximately 1.5 million high school and middle school football players participating in the sport each year. Frederick O. Mueller & Robert C. Cantu, *Catastrophic Sports Injury Research Twenty-Seventh Annual Report, Fall 1982 - Spring 2009* (hereinafter "*Report*"), *a v a i l a b l e a t* http://www.unc.edu/depts/nccsi/2009ALLSPORT.pdf (last

15

Cir. 1997) (affidavit from infectious disease expert regarding CDC-recommended precautions for preventing spread of disease was insufficient to establish that risk of disease without protective equipment was obvious).

Life is fraught with risk of serious harm and the sports world is no exception. But an Eighth Amendment violation may not be predicated on exposure to *any* risk of serious harm; the risk must be "substantial." *See Helling*, 509 U.S. at 33 (Eighth Amendment claim may be based on a condition of confinement "that is sure or very likely to cause serious illness and needless suffering."). Because the record in this case is devoid of evidence from which a reasonable jury could conclude that serious injury is a common or likely occurrence in tackle football games, the District Court did not err in granting Defendants summary judgment on Betts's Eighth Amendment claim.

Moreover, Betts has failed to show that the risk complained of is one that society would refuse to tolerate. A case from the Court of Appeals for the Seventh Circuit is instructive in this regard. *See Christopher v. Buss*, 384 F.3d 879

---

visited August 17, 2010). The Report finds, based on statistics collected over a 27-year period, that the rate of serious injury (including death and paralysis) from football is "less than one per 100,000 participants." *Id.* at 8; *see also* accompanying data tables at 5, *available at* http://www.unc.edu/depts/nccsi/2009ALLSPORTTABLES.pdf (last visited August 17, 2010).

16

(7th Cir. 2004). In *Christopher*, the Seventh Circuit affirmed the dismissal of an inmate's claim that prison authorities had violated his Eighth Amendment rights by failing to correct a "protrusive lip" on the prison softball field that permanently injured his eye after the ball bounced off the lip. *Id*. at 880. The Seventh Circuit held that, even if prison officials knew of and purposefully ignored the defect on the field, the inmate's complaint would fail because "the risk of being hit by a softball as a result of a hazardous field condition is not one that 'today's society chooses not to tolerate.'" *Id*. at 882. "Rather, it is the type of risk many encounter voluntarily when they play sports in less-than-perfect playing conditions." *Id*. ("To say that 'exposure' to [a substandard field] could violate the Eighth Amendment would be to imply that prison officials violate the Eighth Amendment by letting inmates play sports at all, because the risk of injury, even serious injury, is inherent."); *see also Austin v. Johnson*, 328 F.3d 204, 209 (5th Cir. 2003) ("Requiring youthful offenders to perform military-styled exercises for one day is neither cruel nor unusual; it is a deliberate policy choice to instill much-needed discipline."). So too here. The risks of injury posed by tackle football without equipment do not violate contemporary standards of decency. To the contrary, those risks are assumed daily by the incarcerated and the free alike.

Drawing all inferences in favor of Betts, we hold that no reasonable jury could find that allowing him to play tackle football without protective equipment rises to the level of an objectively serious deprivation of "the minimal civilized measure of life's necessities." Thus, Betts has failed to present

17

a genuine dispute of fact regarding the existence of the objective component of an Eighth Amendment violation.

The District Court also held that Betts failed to establish the subjective element of his Eighth Amendment claim: that Defendants were deliberately indifferent to a substantial risk of harm because there was no evidence of a record of injuries during football games at YDC. Betts argues that he has presented adequate evidence of deliberate indifference in the form of: (1) Defendants' deposition testimony acknowledging the dangers associated with playing football and the increased risk of harm from playing without equipment; (2) Defendants' admitted failure to train the residents of YDC about proper tackling techniques; and (3) expert reports opining that the Defendants exposed Betts to an unreasonable risk and showed a conscious disregard for his safety.

As explained by the Supreme Court:

Not every governmental action affecting the interests or well-being of a prisoner is subject to Eighth Amendment scrutiny, however. "After incarceration, only the 'unnecessary and wanton infliction of pain' . . . constitutes cruel and unusual punishment forbidden by the Eighth Amendment." To be cruel and unusual punishment, conduct that does not purport to be punishment at all must involve more than ordinary lack of due care for the prisoner's interests or safety. . . . It is obduracy and wantonness, not inadvertence or error in good faith, that

18

characterize the conduct prohibited by the Cruel and Unusual Punishments Clause, whether that conduct occurs in connection with establishing conditions of confinement, supplying medical needs, or restoring official control over a tumultuous cellblock.

*Whitley v. Albers*, 475 U.S. 312, 319 (1986) (internal citations omitted).

Here, to show the requisite culpability of YDC staff members, Betts must demonstrate that Defendants were "aware of facts from which the inference could be drawn that a substantial risk of harm exists," and that they "also dr[e]w the inference." *Farmer*, 511 U.S. at 837. To overcome a motion for summary judgment, a plaintiff "'must come forward with evidence from which it can be inferred that the defendant-officials were . . . knowingly and unreasonably disregarding an objectively intolerable risk of harm.'" *Beers-Capitol*, 256 F.3d at 132 (quoting *Farmer* 511 U.S. at 846). A plaintiff may demonstrate deliberate indifference by showing that the risk of harm was "longstanding, pervasive, well-documented, or expressly noted by prison officials in the past" such that the defendants "must have known" about the risk. *Farmer*, 511 U.S. at 842-43 (internal quotations omitted). Betts has failed to make the requisite showing of deliberate indifference. As previously explained, it is not obvious that the risks associated with playing tackle football without equipment are unreasonable. Although Betts correctly notes that Defendants acknowledged that playing football could result in grievous injury, and that the risk of injury could increase without

19

protective equipment, this does not satisfy the legal standard of deliberate indifference to a *substantial risk* of serious harm. Moreover, there is no evidence of prior serious injuries resulting from resident football games at YDC. Thus, the evidence is insufficient to raise a genuine dispute of material fact regarding deliberate indifference in this case. Accordingly, the District Court did not err in rejecting Betts's Eighth Amendment claim.

V.

Finally, we turn to Betts's Fourteenth Amendment claim that he was deprived of substantive due process. Specifically, Betts contends Defendants were deliberately indifferent to his liberty interest in bodily integrity and that allowing him to play tackle football without equipment constituted a state-created danger. The District Court rejected both claims, reasoning: (1) because the deliberate indifference necessary for a violation of due process is the same as that for Eighth Amendment violations, Betts's failure to show deliberate indifference in the Eighth Amendment context doomed his substantive due process claim; and (2) Betts failed to establish a state-created danger because the alleged behavior did not shock the conscience. *Betts*, 2009 WL 2913846, at *6-7.

To support his substantive due process claims, Betts points to the same evidence he cited in support of his Eighth Amendment claim. Defendants argue that these claims are barred by the "more-specific-provision rule" because Betts's complaints concerning the conditions of his confinement are properly cognizable under the Eighth Amendment. In the

20

alternative, Defendants contend that the District Court properly found evidence of deliberate indifference to be lacking.

Noting its "reluctan[ce] to expand the concept of substantive due process," the Supreme Court has established the "more-specific-provision rule." *County of Sacramento v. Lewis*, 523 U.S. 833, 843-44 (1998). Under this rule, "if a constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process." *United States v. Lanier*, 520 U.S. 259, 272 n.7 (1997) (clarifying prior holing in *Graham v. Connor*, 490 U.S. 386 (1989)). The Supreme Court explained the rationale behind the rule for Eighth Amendment claims in *Whitley v. Albers*, where a prisoner shot in the leg during a prison riot filed both Eighth Amendment and Fourteenth Amendment substantive due process claims against prison officials:

> [T]he Eighth Amendment, which is specifically concerned with the unnecessary and wanton infliction of pain in penal institutions, serves as the primary source of substantive protection to convicted prisoners in cases such as this one, where the deliberate use of force is challenged as excessive and unjustified. It would indeed be surprising if, in the context of forceful prison security measures, "conduct that shocks the conscience" or "afford[s] brutality the cloak of law," and so violates the Fourteenth Amendment, were not also punishment "inconsistent with

21

contemporary standards of decency" and "'repugnant to the conscience of mankind,'" in violation of the Eighth. . . . [I]n these circumstances the Due Process Clause affords respondent no greater protection than does the Cruel and Unusual Punishments Clause.

475 U.S. at 327 (internal citations omitted). *Compare with County of Sacramento*, 523 U.S. at 843 (rejecting application of more-specific-provision rule to substantive due process claim arising from high speed police chase because facts were not within "search and seizure" protections of Fourth Amendment).

Although we have not previously applied the more-specific-provision rule in a precedential opinion, at least four of our sister circuit courts of appeals have done so. *See United States v. Hernandez*, 333 F.3d 1168, 1174 (10th Cir. 2003) (analyzing Plaintiff's allegations of governmental invasion of his attorney-client relationship only under Sixth Amendment right to counsel and not under Fifth Amendment Due Process Clause because "[w]here a litigant challenges governmental action under the Due Process Clause and under another, more specific constitutional provision, we analyze the claim under the latter, more specific provision"); *Austin*, 328 F.3d 204, 210 n.10 (5th Cir. 2003) (construing boot camp detainee's complaint as raising claims under only Eighth Amendment: "[b]ecause the Eighth Amendment, as 'an explicit textual source of constitutional protection,' defines the limits of government action, it controls over 'the more generalized notion of substantive due process.'" (quoting *Graham v. Connor*, 490 U.S. at 395 (1989)); *Galbraith v. County of Santa Clara*, 307 F.3d

22

1119, 1127 (9th Cir. 2002) (dismissing arrestee's substantive due process claim against county coroner alleging falsification of autopsy report because claim fell within more specific provision of the Fourth Amendment); *Tesch v. County of Green Lake*, 157 F.3d 465, 471-72 (7th Cir. 1998) (holding that wheelchair-bound arrestee could not pursue substantive due process claim alleging unnecessary exposure to danger during arrest because allegations fell within more specific provisions of a Fourth Amendment claim for excessive force and unreasonable seizure).

Betts does not cite any case law for the proposition that he may bring both substantive due process and Eighth Amendment claims challenging the same conduct. Moreover, Betts's claims concern his conditions of confinement and an alleged failure by Defendants to ensure his safety. Because these allegations fit squarely within the Eighth Amendment's prohibition on cruel and unusual punishment, we hold that the more-specific-provision rule forecloses Betts's substantive due process claims.[10]

## VI.

In sum, we will affirm the District Court's summary judgment in favor of YDC and its staff in their official

---

[10] In light of our adoption of the more-specific-provision rule, we need not address Betts's arguments under the Fourteenth Amendment regarding deliberate indifference to his right to bodily integrity or the state-created danger doctrine.

23

capacities because YDC is an arm of the state entitled to Eleventh Amendment immunity. We will also affirm the District Court's summary judgment for the individual Defendants on the merits of Betts's Eighth Amendment claim because Betts failed to show a substantial risk of serious harm that violates contemporary standards of decency and failed to show deliberate indifference. Finally, our adoption of the more-specific-provision rule obviates the need to address Betts's Fourteenth Amendment substantive due process claims.