PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 16-1988
_____

PHILIP A. WHARTON; JOSEPH ROUNDTREE;
JAMES MADDOX; LAMAR CORREA,
Appellants

v.

CARL C. DANBERG; CATHY ESCHERICH;
REBECCA MCBRIDE; ROBERT COUPE
_____

APPEAL FROM THE UNITED STATES DISTRICT
COURT
FOR THE DISTRICT OF DELAWARE
(D.C. Civ. Action No. 1-12-cv-01240)
District Judge: Honorable Leonard P. Stark
_____

Argued November 3, 2016
_____

Before: JORDAN, GREENAWAY, JR., and RENDELL,
*Circuit Judges*.

(Opinion Filed: April 19, 2017)

Stephen A. Hampton, Esq. [ARGUED]
Grady & Hampton
6 North Bradford Street
Dover, DE 19904
        *Counsel for Appellants*

Michael F. McTaggart, Esq. [ARGUED]
Delaware Department of Justice
820 North French Street
Carvel Office Building, 6th Floor
Wilmington, DE 19801
        *Counsel for Appellees*

Richard H. Morse, Esq.
American Civil Liberties Union
100 West 10th Street, Suite 706
Wilmington, DE 19801
        *Counsel for Amicus Curiae*

_____

OPINION
_____


GREENAWAY, JR., *Circuit Judge*.


This putative class action alleges that the Delaware correctional system routinely fails to release inmates in a timely manner, holding them for days or weeks beyond when they should be set free. Appellants, a group of inmates who were over-detained, have sued top correctional officials—

2

specifically, former Delaware Department of Corrections ("DDOC") Commissioner Carl Danberg, current DDOC Commissioner Robert Coupe,[1] and Rebecca McBride, the current Director of the DDOC Central Offender Records division ("COR")—seeking both damages and structural reform of COR. The District Court granted summary judgment in favor of Danberg, McBride, and Coupe (Appellees). We will affirm.

## I.    FACTS

In 2008, the Delaware correctional system was facing scandal for its handling of inmate releases. One inmate, Jermaine Lamar Wilson, committed suicide in his cell on the day he was supposed to be—but was not—released.[2] Dozens of other inmates had either been released too early or too late. National experts, cited in contemporaneous press reports, expressed surprise about how many Delaware inmates were improperly released. As gubernatorial candidates from both parties attacked the state correctional system, there was high-level support for reform.

That reform took shape in the establishment of a new Central Offender Records office within the Delaware Department of Corrections. Previously, staff at each prison handled releases individually. COR was meant to centralize,

---

[1] The District Court allowed the substitution of Coupe for Danberg as a defendant for purposes of prospective relief only.

[2] *Wilson v. Taylor*, 597 F. Supp. 2d 451, 457-58 (D. Del. 2009).

3

standardize, and generally improve the state's processing of inmate releases. The creation of COR, led by then-DDOC Commissioner Carl Danberg, was a substantial bureaucratic undertaking, requiring the department to coordinate with legislators, the judiciary, and its unionized employees.

This litigation, however, contests whether centralization has brought improvement. Appellants allege that Delaware's problems with over-detentions have, if anything, gotten worse since 2008.

Under the new system, after an inmate is ordered to be released (because he or she posted bail, because their bail was changed from secured to unsecured, or because they completed their sentence, to offer a few examples), the court is supposed to fax an order to COR. COR then checks whether there is a reason to continue holding the individual— for example, an outstanding warrant—and if there is not, sends instructions to the facility where they are being held for that individual's release.

Undoubtedly, there were bumps along the way to a centralized system. In 2008, Danberg himself admitted that the creation of COR had caused confusion during the transition itself. Led by Appellees, DDOC has attempted to improve COR's functioning since its inception. COR has an official goal of processing all releases within 24 hours. Observing delays in the processing of releases, Appellees have increased staffing levels. They created a new six-month orientation period for new hires at COR. In 2010, COR adopted a new computer system, called the Delaware Automated Correction System ("DACS") which is meant to foster better tracking of release dates and the "triage" of

records to prioritize releases.[3]  JA 15.  Finally, COR created a new priority unit for releases likely to be fast and easy, such as those whose bail is changed to unsecured or those whose charges are dismissed.  According to McBride, she and her co-defendants are "always looking at ways to be more efficient."  JA 12.

Even with these interventions, however, Appellants suggest that COR is badly broken, causing or allowing the over-detention of as many as thousands of inmates a year.[4]  To support their theory of over-detention, Appellants submitted a disparate and somewhat disjointed assortment of affidavits from several witnesses whose work brings them in close contact with the correctional system.  These affidavits, described below, reported huge numbers of over-detentions, albeit in an impressionistic fashion based on the affiants' own personal observations and estimates.

First, a former records clerk at COR named Brenda Bell[5] estimated that 10 to 20 percent of release orders

---

[3]  One COR employee, however, averred that the new computer system "caused more delays."  JA 163.

[4]  The parties dispute in the briefing exactly how "over-detention" should be defined and in particular whether over-detentions of a certain length of time should qualify.  This issue is not material to this appeal.

[5]  Bell worked at COR for roughly one year between 2011 and 2012.  She worked as a Records Clerk and Records Specialist during her employment, positions that involved work on release orders.

received by COR were not processed and sent to a correctional facility within 24 hours, and that 20 to 30 inmates per week ended up spending more than two days waiting for COR to send their release order to their facility.

Second, a bail bondsperson, Bruny Mercado,[6] calculated that about 35 percent of people for whom she had posted bond were held for more than 24 hours after bond was posted, and 25 percent of people were held for more than 48 hours afterward. Mercado also said that she had seen no improvement at COR in its four years of existence.

Third, a Delaware public defender, Sandra Dean,[7] averred that over-detention was a "consistent problem" for her clients. JA 179. She reported that she had her secretary call COR every day to inquire about clients whose release had been ordered by the courts and that she followed up personally with COR for clients who were not released after three days. Notably, although Dean only served as a public defender until 2010, she claimed that the over-detention problem worsened at the end of that period.

---

[6] Mercado has owned and operated her own bail bond company since 2002 and posts bail for approximately 25 to 30 people in Delaware per month. She and her employees observe the release process after they post bond for their clients and communicate with COR during that process.

[7] Dean worked as an attorney for the Delaware Office of the Public Defender from 1991 to 2010. When her clients were over-detained, she worked to secure their release.

Given that COR processes between 16,000 and 18,000 releases per year, these affidavits allege as many as 6,300 over-detentions a year. The affidavits also allege that COR was informed of the problem, both by Dean's regular inquiries and by Mercado, who stated that she had spoken personally with McBride about the over-detention problems.

On the other hand, hard, reliable data about the number of over-detentions occurring each year is more or less missing from the record. Appellants' affidavits put forth various estimates of the over-detention problem, but no precise quantification or authoritative analysis. They offer a limited ability to understand how the problem has changed over time.

In contrast, Appellees do not even attempt to provide a systematic accounting of over-detentions from their own archives. Rather, they base their count of over-detentions on Appellants' ability to identify specific over-detained inmates.

The record does include various tables purporting to show the number of over-detentions each month, which totaled to two each year of the relevant period except for FY '10, when there were 18 over-detentions. But neither party treats those tables as reliable. Given the absence of information about the source of that data, we likewise decline to treat these tables as reliable.[8]

---

[8] At oral argument, Appellants claimed that those tables count only the over-detentions specifically brought to McBride's attention. This is not evident from the record, but if it were so, that would not provide any reliable metric for the actual number of over-detentions.

7

According to Appellants, two specific problems at COR, in addition to the general failure of the centralization effort, account for the continuing trouble with over-detentions. First, they claim that COR is under-staffed generally and particularly short-handed on nights and weekends. COR employees and former employees testified that the division would be able to process releases more quickly and avoid over-detentions if it had more staff or was open more hours. Coverage is worse on weekends: although fewer releases arrive at COR on weekends, staffing levels are more-than-proportionally thinner. COR also typically closes its offices between 10:00 p.m. and 5:00 a.m. and over holidays, which Appellants allege leads to worse delays during those periods (Delaware's Justice of the Peace Courts, which send releases to COR, remain open 24/7). During those periods, however, COR supervisors are on call around the clock to handle any problems that might arise. Appellee McBride testified that she has never received any complaints about coverage while COR offices were closed, and there is no record evidence that over-detentions cluster around holidays or are otherwise affected by these closures.

Second, Appellants argue that COR is unresponsive to inmates and those acting on their behalf. Prisoners cannot contact COR directly, except by mail. If they want more immediate communication with COR—and time is of the essence for an inmate detained past his release date—they must request that prison staff email COR. Prisoners' families, friends, and bail bondsmen can call COR directly, but generally complain that COR is frequently unhelpful or indifferent, when it can be reached at all. Outside input allegedly falls on deaf ears. But inmates and their associates are the individuals best placed to know that they have been

8

over-detained—they have access to information and strong incentives to monitor COR—and could play an important oversight function if allowed.

Indeed, the record shows that when inquiries did reach COR, they helped spur COR to fix problems. Sandra Dean, the public defender, noted her practice of routinely contacting COR about over-detained clients. She stated that additional pressure, such as threatening to contact a judge or initiate a contempt proceeding, helped more. Conversely, Dean observed that those least able to speak for themselves when over-detained, like the handicapped or those who did not speak English, were at greater risk. Likewise, after Appellants complained of being over-detained, prison officials urged them to contact COR because that was the best way to speed their release. COR's alleged failure to communicate potentially deprives COR of an alert system and allows errors to fester. That said, McBride testified that family members, courts, and correctional officers are able to reach her directly with complaints about over-detention and that she responds to those complaints with an immediate investigation into the inmate's situation.

## II. PROCEDURAL BACKGROUND

Plaintiffs filed their complaint on October 1, 2012. At the close of discovery, Plaintiffs moved for class certification and Defendants for summary judgment.

The District Court's opinion denied the motion for class certification and granted summary judgment. Defendants prevailed *in toto*. Class certification was denied on commonality grounds because some members of the proposed class were over-detained due to delays in the court

system, rather than delays at COR. The Court found that there was no "common contention" the truth of which could "resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes,* 564 U.S. 338, 350 (2011). The Court also found that all claims against Defendants in their official capacities were barred by sovereign immunity; it declined to reach the question of qualified immunity; and it granted summary judgment on Appellants' state law claims.

The Court framed its analysis of the core federal constitutional claims by using the "more-specific-provision rule." Specifically, the Court determined that the rule meant that any substantive due process claims should be addressed only under the more specific Eighth Amendment analysis of cruel and unusual punishment. *See Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 261 (3d Cir. 2010). In that Eighth Amendment analysis, the District Court held that Plaintiffs failed to demonstrate a genuine dispute of material fact on two required elements of their claim—deliberate indifference by Defendants to the risk of over-detentions and a causal connection between Defendants' acts and Plaintiffs' over-detentions.

In this respect, the Court found particularly determinative: 1) press coverage praising defendant Danberg for his creation of COR and his efforts to fix the over-detention problem, 2) defendant McBride's familiarity with COR procedures and her work to improve them, and 3) defendant Coupe's formation of a special unit to speed up daily bail releases.

Plaintiffs filed a Rule 59(e) motion to amend the judgment, which was denied because Plaintiffs simply

10

rehashed the arguments posed on summary judgment. Plaintiffs then appealed all of the federal claims asserted.

## III.    STANDARD OF REVIEW[9]

On appeal from a grant of summary judgment, the Court of Appeals' review is "plenary" and the court should "apply the same test the district court should have utilized initially." *Giles v. Kearney*, 571 F.3d 318, 322 (3d Cir. 2009) (citation omitted). Summary judgment should be granted only when the record shows that "there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[A]ll justifiable inferences are to be drawn in [the nonmovant's] favor" but the "mere existence of some evidence in support of the nonmovant is insufficient to deny a motion for summary judgment; enough evidence must exist to enable a jury to reasonably find for the nonmovant on the issue." *Giles*, 571 F.3d at 322 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 255 (1986)).

In deciding whether to certify a class under Federal Rule of Civil Procedure 23, a district court must make "findings" and factual determinations. *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 320 (3d Cir. 2008). The burden of proof rests with the movant to "affirmatively

---

[9] The District Court had jurisdiction over this civil rights action pursuant to 28 U.S.C. §§ 1331 and 1343 and exercised supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367. The District Court's summary judgment constituted a final decision and this Court has jurisdiction pursuant to 28 U.S.C. § 1291.

demonstrate" certifiability by a preponderance of the evidence. *Wal-Mart*, 564 U.S. at 350. The District Court's denial of class certification is reviewed for abuse of discretion. *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 165 (3d Cir. 2001).

## IV.    ANALYSIS

### A.    *Eighth Amendment Legal Standards*

Our standard for analyzing over-detention claims is well-established. An inmate's detention after his term of imprisonment can, under certain circumstances, constitute cruel and unusual punishment, in violation of the Eighth Amendment. *Montanez v. Thompson,* 603 F.3d 243, 250 (3d Cir. 2010). Continued incarceration beyond that point is clearly punitive, and in many cases will serve no penological justification at all. *Sample v. Diecks*, 885 F.2d 1099, 1108 (3d Cir. 1989). That said, we also recognize that "[t]he administration of a system of punishment entails an unavoidable risk of error" and that "[e]limination of the risk of error in many instances would be either literally impossible or unfeasible because prohibitively costly." *Id.* The Eighth Amendment does not, and could not, require the elimination of all such risk of error.

Thus, we have established a three-part test for over-detention claims. A plaintiff must show:

> (1) a prison official had knowledge of the prisoner's problem and thus of the risk that unwarranted punishment was being, or would be, inflicted; (2) the official either failed to act or took only ineffectual action under the circumstances, indicating that his

12

response to the problem was a product of deliberate indifference to the prisoner's plight; and (3) a causal connection between the official's response to the problem and the unjustified detention."

*Montanez*, 603 F.3d at 252.[10]

---

[10] Our precedent also describes the test for supervisor liability under the Eighth Amendment as a four-part test: "the plaintiff must identify a specific policy or practice that the supervisor failed to employ and show that: (1) the existing policy or practice created an unreasonable risk of the Eighth Amendment injury; (2) the supervisor was aware that the unreasonable risk was created; (3) the supervisor was indifferent to that risk; and (4) the injury resulted from the policy or practice." *Beers-Capitol v. Whetzel*, 256 F.3d 120, 134 (3d Cir. 2001). *But see Barkes v. First Corr. Med., Inc.*, 766 F.3d 307, 341 (3d Cir. 2014) (Hardiman, J., dissenting), *rev'd on other grounds sub nom. Taylor v. Barkes*, 135 S. Ct. 2042 (2015) (questioning validity of four-part test). For purposes of this litigation, the two formulations of the Eighth Amendment standard are functionally equivalent, each broadly requiring risk, knowledge, deliberate indifference and causation. We find the over-detention-specific description of our standard better structures our analysis in this case. In any event, because Plaintiffs fail to show deliberate indifference, as explained herein, they could not survive summary judgment under either standard.

Up to now, our over-detention jurisprudence has concerned individual plaintiffs challenging decisions specific to themselves. In *Sample v. Diecks*, our first decision in this line of cases, a prison records officer mistakenly determined that an inmate still had time to serve on another sentence and authorities therefore refused to release him. 885 F.2d at 1102. Then came *Moore v. Tartler*, 986 F.2d 682 (3d Cir. 1993), which concerned parole officers who initially misinterpreted a judge's sentencing order, resulting in a six-month delay in the inmate's release while officials conducted an investigation. Most recently, *Montanez v. Thompson* likewise involved various calculations of a particular inmate's sentence. 603 F.3d at 246-48.

In contrast, Plaintiffs here allege systemic shortcomings at COR. The problems are not prisoner-specific misapplications of the law, but organizational policies and practices. Nevertheless, the same standard applies, although it must be applied with sensitivity to the change of context. In particular, we have noted that the position of the defendant in an over-detention suit must affect the second prong of our test: deliberate indifference. "Among the circumstances relevant to a determination of whether the requisite attitude was present are the scope of the official's duties and the role he or she has played in the everyday life of the prison." *Sample*, 885 F.2d at 1110. An official is less likely to display deliberate indifference if "there are procedures in place calling for others to pursue the matter" and more likely to be deliberately indifferent if given his or her role, a problem

14

"will not likely be resolved unless he or she addresses it or refers it to others[.]" *Id.*[11]

This flexible standard for deliberate indifference, which foresees suits against officials up and down the organizational chart of the prison system, anticipates that over-detention claims may raise structural challenges as well as individual ones. Indeed, this is the necessary corollary of our recognition that the "administration of a system of punishment entails an unavoidable risk of error." *Sample*, 885 F.2d at 1108. Operating a prison system is a major bureaucratic undertaking. That fact compels us to offer individual prison officials room for imperfection and accidents. But it also teaches that preventing over-detentions may require bureaucratic solutions from top management. Litigation against top administrators, seeking structural reforms of the agency as a whole, may be the only effective way to reduce the overall risk of unconstitutional error. Where appropriate, we must treat the correctional system as a system.

Suits against high-level government officials must satisfy the general requirements for supervisory liability. In

---

[11] Here, Appellees are the officials tasked with resolving the alleged problems. Appellants allege that structural features of COR cause a systemic over-detention problem. Only top administrators, not line staff processing individual releases, can increase staffing levels, foster a more open culture of communication or declare the creation of COR a success or failure. The problems alleged in this litigation "will not likely be resolved unless" top administrators like Appellees address them. *Sample*, 885 F.2d at 1110.

15

particular, supervisors are liable only for their own acts; in this case, they are liable only if they, "with deliberate indifference to the consequences, established and maintained a policy, practice or custom which directly caused [the] constitutional harm." *A.M. ex rel. J.M.K. v. Luzerne Cty. Juvenile Det. Ctr.*, 372 F.3d 572, 586 (3d Cir. 2004) (quoting *Stoneking v. Bradford Area Sch. Dist.*, 882 F.2d 720, 725 (3d Cir. 1989)) (alteration in original). This standard for supervisory liability largely overlaps with the over-detention standard—both require a showing of deliberate indifference and causation—but centers the inquiry around a policy or practice.

## B. *Eighth Amendment Analysis*

We agree with the District Court that Appellants established a genuine dispute of material fact as to the first prong of the over-detention standard: knowledge of a risk of unwarranted punishment. Fundamentally, COR was created because DDOC was aware of what it believed to be an unacceptable level of over-detention in Delaware.[12] Moreover, there is record evidence that those near to the correctional system warned Appellees of continuing over-detention problems post-2008, including the public defender, Sandra Dean, and the bail bondsperson, Bruny Mercado. While the record does not allow for the exact calculation of over-detention levels or year-by-year trends in over-detention, a jury could reasonably find the overall level of over-detention to be quite substantial. Indeed, McBride's own

---

[12] Whether the pre-2008 system in fact failed to meet constitutional standards is outside of our purview in this matter.

16

testimony shows an awareness of continuing challenges at COR: She admitted at her deposition that she has always perceived a problem with the timely processing of releases, since the creation of COR. Her efforts to improve COR came in response to a sense that there was a need for change in the agency's operations.

Appellants fail, however, to show a genuine dispute of material fact as to the second prong: deliberate indifference. As the District Court held, the record shows a variety of efforts by Appellees to improve COR and address the over-detention problem. For example, not only did McBride increase staffing levels at COR, she offered uncontradicted testimony that she did so specifically in response to delays in processing. Likewise, her efforts to improve the agency's training system, to upgrade its technology, and to create special units to more efficiently handle certain types of release show, as she testified, that COR leadership was "always looking at ways to be more efficient." JA 12.

These facts weigh heavily against any reasonable finding of deliberate indifference. In *Moore v. Tartler*, we observed that deliberate indifference had been "demonstrated in those cases where prison officials were put on notice and then simply refused to investigate a prisoner's claim of sentence miscalculation." 986 F.2d at 686 (citing *Alexander v. Perrill*, 916 F.2d 1392, 1398 (9th Cir. 1990) and *Haygood v. Younger*, 769 F.2d 1350 (9th Cir. 1985)). Because the parole board officials' investigation in *Moore* constituted "affirmative steps" to resolve the issue, we could not find deliberate indifference. *Id.* at 687. Here, Appellees have also taken affirmative steps to address over-detentions in the Delaware system and this makes a finding of deliberate indifference difficult.

17

But the presence of such affirmative steps is not necessarily dispositive. A further inquiry, not undertaken by the District Court, is required in this case. In *Moore*, the parole officers' investigation was targeted to resolve the inmate's complaint in full. Although the investigation was slow, the officials could safely conclude that upon its completion they would have done all that they could do to address Moore's over-detention. Here, it is not self-evident that the COR reforms were up to the task at hand. "[I]neffectual action under the circumstances" can also indicate deliberate indifference. *Montanez*, 603 F.3d at 252.

This is not to say that federal courts conduct independent reviews of the wisdom of prison policy. The purpose of addressing "ineffectual action" is not to render a program evaluation. The ultimate subject of inquiry remains deliberate indifference: a state of mind. We look to see whether the gap between the officials' actions or inaction and the problem they were trying to solve was so large that those actions display deliberate indifference. Imagine an inmate who came to the prison infirmary with a cut and with kidney failure and was given only a bandage. We would have no trouble concluding that this could constitute deliberate indifference. *Cf. Rouse v. Plantier*, 182 F.3d 192, 194-95, 198-99 (3d Cir. 1999) (suggesting that providing diabetic inmates with only one insulin injection per day and less-than-daily blood sugar monitoring, when they needed more, can constitute deliberate indifference).

By the same token, supervisory efforts to minimize over-detentions in one manner could, in principle, co-exist with deliberate indifference to a festering over-detention problem rooted in different agency practices or policies. Given the allegations of rampant over-detention—affecting as

many as one-third of inmates—a jury could might reasonably ponder whether something along these lines was occurring.

But an argument of this sort requires evidence to survive summary judgment. While Appellants may have shown a genuine dispute whether over-detentions remain a large-scale problem in the Delaware correctional system, there is no genuine dispute regarding whether Appellees have tried to address the over-detention problem. Viewing the facts in the light most favorable to Appellants, we could conclude that over-detentions are rampant in Delaware and that correctional officials are trying, albeit without great success, to tackle that challenge. So far, this is not deliberate indifference. Appellants need more to rescue their claim. They would need to show that Appellees' efforts to improve COR so obviously miss the mark that pursuing those efforts manifests disregard for the real problem and thereby amounts to deliberate indifference. Such evidence is absent from the record.

On summary judgment, the nonmoving party must affirmatively "show where in the record there exists a genuine dispute over a material fact." *Doe v. Abington Friends Sch.*, 480 F.3d 252, 256 (3d Cir. 2007). "[S]peculation and conjecture may not defeat a motion for summary judgment[.]" *Acumed LLC v. Advanced Surgical Servs., Inc.*, 561 F.3d 199, 228 (3d Cir. 2009) (citing *Lexington Ins. Co. v. W. Pa. Hosp.*, 423 F.3d 318, 332-33 (3d Cir. 2005)). But speculation is all that Appellants can put forward to show that the DDOC officials were deliberately indifferent notwithstanding their efforts to improve the release process. The record offers no reason to believe that Appellees' chosen interventions were callously misguided.

For example, Appellants offer an affidavit from a former COR employee stating that the computerized DACS system increased delay. Whether DACS was a successful technological upgrade is not a dispute sufficient to go to trial. It does not show a dispute that computerization was misguided from the start. Moreover, McBride testified that DACS has helped COR be more efficient and has sped up the release process. She admitted that there were issues with the system that needed to be resolved, but did not indicate that COR would leave those issues unaddressed. DACS may have been "ineffective" in the sense that it did not immediately reduce over-detentions—but that is not the test. Rather, Appellants must show that COR's ineffectiveness amounted to deliberate indifference.

Likewise, it may be the case that COR needs more staff. There is evidence to that effect, sufficient to create a factual dispute. But the record also shows that McBride observed a need for more staff, worked with other officials to calculate how many more staff were required, and secured those positions from more senior authorities within state government. Separately, COR also increased the number of casual/seasonal staff used to pull and re-file records, again in response to a perceived need and a review of agency operations. To show deliberate indifference on the staffing issue, Appellants would need evidence that would allow a jury to conclude, for example, that COR knew its staffing increases would be insufficient or that after it realized it still needed more staff after the first round of hires, it did nothing in response. No such evidence is in this record.

With regards to COR's unresponsiveness to outside communications, a different sort of evidence would be needed to establish deliberate indifference. Appellants demonstrated

20

a dispute whether COR was open to inquiries from inmates and whether increased openness would help reduce over-detentions. As already noted, there is evidence to suggest that inmates were urged to contact COR to expedite their release and that where contact was made, such as by a public defender, it really did spur action. But the record does not show that COR took any particular action to improve this problem. Although this may be more indicative of deliberate indifference, what is absent here is any evidence showing that COR should have addressed this problem with particular alacrity as opposed to any other. Had the crux of the evidence presented to the District Court been that closed channels of communication caused particularly large numbers of over-detentions; that an alternative system had been presented to COR or was a best practice they should have known to adopt; or that changes to COR's communications policy would have been easier or more efficacious than COR's other reform efforts, then Appellants may have been in a different posture regarding summary judgment.[13]

Nor could a reasonable jury infer deliberate indifference from the simple fact that over-detentions increased in this period (if the jury found that they did). There are surely many variables that affect the over-detention

---

[13] Even less indicative of deliberate indifference is Appellants' assertion that COR failed to track certain performance metrics, such as the number of lost files or the number of inmate letters received. No record evidence is put forward that could allow a finding that these metrics should have been used rather than the alternative forms of tracking and oversight employed at COR, much less that Appellees were deliberately indifferent for failing to use them.

problem. In particular, there is substantial and uncontested record evidence that many over-detentions originate in the court system rather than at COR. It is entirely plausible that the overall increase in over-detentions stemmed from changes outside COR and that the reform efforts at COR, though effective, were swamped by external forces. To survive summary judgment, Appellants need more than speculation connecting any increase in over-detentions with the COR policies they deem ineffective.

A comparison with a similar, successful over-detention suit is instructive. In *Barnes v. District of Columbia*, 793 F. Supp. 2d 260 (D.D.C. 2011), the Court was presented with a far richer evidentiary picture—and plaintiffs were able not only to avoid summary judgment, but to win summary judgment themselves on certain of their claims. There, as here, the correctional officials had made efforts to reduce over-detentions and there, as here, plaintiffs argued that those efforts were ineffectual. But plaintiffs were able to carry their burden. They hired a statistical expert to sift through correctional records and provide reliable annual estimates of how many people had been over-detained. *Id.* at 269-70. What is more, they were able to estimate how many of those over-detentions were attributable to specific policies. *Id.* at 271. This allowed the Court to determine that the District of Columbia's early efforts to reduce over-detentions were utterly ineffectual, allowing a grant of summary judgment for plaintiffs, and that the District's later efforts were quite effective, allowing a grant of summary judgment for defendants (whether the District's efforts during an intermediate period showed deliberate indifference required factfinding). *Id.* at 280-81. Plaintiffs in *Barnes* could also demonstrate precisely how long processing a release should

22

take and how much longer it often took in practice. *Id.* at 278-79. This sort of data allowed plaintiffs to show deliberate indifference to over-detentions, even in the face of affirmative steps to improve matters. Appellants have not shown deliberate indifference here. We therefore affirm the District Court's grant of summary judgment for Appellees on all Eighth Amendment claims.

## C.    *Fourteenth Amendment Analysis*

For the same reasons, we affirm the District Court's grant of summary judgment on all Fourteenth Amendment substantive due process claims. The District Court dismissed Plaintiffs' Fourteenth Amendment claims under the "more-specific-provision rule." That rule holds that "if a constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process." *United States v. Lanier*, 520 U.S. 259, 272 n.7 (1997); *see also Betts*, 621 F.3d at 261. The District Court held that because the Third Circuit addresses over-detention under the rubric of the Eighth Amendment, Plaintiffs could not bring parallel claims under the Fourteenth Amendment's protection of substantive due process.

Appellants and amicus argue that the more-specific-provision rule does not apply to all claims, because some plaintiffs were pretrial detainees, who are not protected by the Eighth Amendment.[14] Our Court has always analyzed over-

---

[14] They also argue that Plaintiffs' claims arose under a procedural due process framework rather than a substantive due process framework. This argument is waived. Plaintiffs'

detention claims under the Eighth Amendment, unlike some other courts. *See Barnes*, 793 F. Supp. 2d at 274-75 ("Overdetentions potentially violate the substantive component of the Due Process Clause. . . ."). But we have applied the Eighth Amendment because each of our over-detention cases involved convicted and sentenced inmates. *Montanez*, 603 F.3d 243; *Moore*, 986 F.2d 682; *Sample*, 885 F.2d 1099.

Our precedent is clear that while the detention of sentenced inmates is governed by the Eighth Amendment, the treatment of pretrial detainees is governed by the Due Process Clause. *Bell v. Wolfish*, 441 U.S. 520, 535 n.16 (1979) ("Due process requires that a pretrial detainee not be punished. A sentenced inmate, on the other hand, may be punished, although that punishment may not be 'cruel and unusual' under the Eighth Amendment."); *Boring v. Kozakiewicz*, 833 F.2d 468, 471 (3d Cir. 1987) ("Pretrial detainees are not within the ambit of the Eighth Amendment but are entitled to the protections of the Due Process clause."); *Hubbard v. Taylor*, 399 F.3d 150, 164-67 (3d Cir. 2005) (same).

For pretrial detainees, therefore, there is no applicable provision more specific than the Due Process Clause and the more-specific-provision rule does not apply. A separate due process analysis is required.

The protections of the Eighth Amendment and Due Process Clauses are sometimes, but not always, the same. *Hubbard*, 399 F.3d at 164-67. We need not delve into the

---

arguments below expressly identified their claims as being for substantive due process.

24

differences between those two analyses in this context, however.  This is a suit against supervisory officials, for the creation of policies and practices.  Supervisory policy-and-practice liability requires deliberate indifference.  *A.M. ex rel. J.M.K.*, 372 F.3d at 586.  Thus, for the same reasons as in our Eighth Amendment analysis, we conclude that there is no genuine dispute of material fact as to deliberate indifference under the Fourteenth Amendment.  We will affirm.[15]

---

[15] Having affirmed the District Court's grants of summary judgment on the merits, we need not reach the other issues in the Court's opinion: qualified immunity, sovereign immunity, and class certification.  We also need not reach the causation prong of the Eighth Amendment analysis.