**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 19-3305
_____

LAMONT ZAMICHIELI,
Appellant

v.

PENNSYLVANIA DEPARTMENT OF CORRECTIONS; CHCA WILLIAM
NICHOLSON; PA-C NATALIE D. AUSTIN; CRNP LORI RIDINGS; UNIT
MANAGER TINA STALEY; MR. SPIKER, Block Counselor; MEDICAL DIRECTOR
MIKE HICE; C/O LIPTAK, Block Officer; C/O PRICE; CCPM KAREN SOKOL,
Program Review Committee; MARK DIALESANDRO, DSCS; DAN CARO, Major of
Unit Management and other unknown employees responsible whose names are not
known at this time; SUPERINTENDENT ROBERT GILMORE; TRACY SHAWLEY,
Grievance Coordinator, Superintendent Assistant, *ROBERT VALLEY

(*Dismissed pursuant to Court's 4/23/21 Order)
_____

On Appeal from the United States District Court
for the Western District of Pennsylvania
(District Court Civil No. 2-17-cv-00742)
District Judge: Honorable Cynthia R. Eddy
_____

Argued on April 29, 2021
_____

Before: PHIPPS, NYGAARD, and ROTH, *Circuit Judges*.


(Filed: March 14, 2022)
_____

James S. Ballenger
Jennifer Elchisak [ARGUED]
Virginia Oat [ARGUED]
University of Virginia Law School
580 Massie Road
Charlottesville, VA 22903

*Counsel for Appellants*

Josh Shapiro, Attorney General
Anthony T. Kovalchick [ARGUED]
Daniel B. Mullen
Office of Attorney General of Pennsylvania
1251 Waterfront Place, Mezzanine Level
Pittsburgh, PA 15222

*Counsel for Appellee Pennsylvania Department of Corrections*

Alex R. Ferrante [ARGUED]
Alan S. Gold
Gold & Ferrante
716 North Bethlehem Pike, Suite 208
Lower Gwynedd, PA 19002

*Counsel for Appellees Austin, Ridings, and Hice*

_____

OPINION[*]
_____

NYGAARD, *Circuit Judge*.

Lamont Zamichieli appeals the District Court's grant of summary judgment for defendant-appellees in this suit alleging that they violated his civil rights during his

---

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

incarceration in the Pennsylvania Department of Corrections ("PA DOC").[1] We will

affirm the summary judgment on his claim that they retaliated against him for filing

grievances. But as to Zamichieli's allegation that he fell down the stairs and had a seizure

because he was housed on the upper tier with deliberate indifference to his epilepsy, we

will affirm only to the extent that the District Court entered judgment on his claims

seeking redress for appellees' failure to accommodate his request for a lower-tier cell

assignment. As for his claims alleging that appellees' deliberate indifference to his

documented seizure disorder caused his fall and seizure, we will reverse and remand.

## I.      Zamichieli's Claims Based on his Housing, Fall, and Seizure

Zamichieli claims that appellees housed him on the top tier of SCI Greene despite

knowing that, as an epileptic, he needed to be housed on the lower tier, and that

appellees' deliberate indifference to that serious medical need caused him to fall while

walking down the stairs and have a seizure. Based on those allegations, he sued the PA

DOC, ten prison officials, and four medical staff for violating the Americans with

Disabilities Act, the Rehabilitation Act, and the Eighth Amendment.

The District Court rejected those claims on summary judgment. The Court mostly

addressed Zamichieli's claims in terms of appellees' failure to timely move him to lower

tier status and reasoned that, because Zamichieli did not file a grievance until after his fall

---

[1] The District Court had jurisdiction under 28 U.S.C. §§ 1331 and 1343, and the parties consented to a Magistrate Judge's exercise of that jurisdiction in accordance with 28 U.S.C. § 636(c)(1). This Court has appellate jurisdiction under 28 U.S.C. § 1291. We review the District Court's grant of summary judgment *de novo*. *Renchenski v. Williams*, 622 F.3d 315, 324 (3d Cir. 2010).

and seizure, he failed to exhaust administrative remedies as required by the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a). The Court also held that, to the extent Zamichieli claimed appellees were deliberately indifferent to his epilepsy before his fall and seizure, those claims failed because he "failed to set forth sufficient facts that the medical treatment he received [from medical staff] was inappropriate, let alone that [prison officials] were aware of any such inappropriateness, and failed to properly address the situation." JA 39 n.6.

Zamichieli now argues that the District Court erred because he could not, and therefore need not, exhaust administrative remedies before he fell and had a seizure. He also contends that he adduced sufficient facts for a reasonable factfinder to determine that appellees' deliberate indifference to his epilepsy caused him to fall down the stairs and have a seizure. He is, for the most part, correct.

A.     **Administrative Exhaustion**

SCI Greene housed Zamichieli on the upper tier for about six weeks, despite a PA DOC Physician's Order, issued earlier at another PA DOC facility, to house him on the ground level for medical reasons. He alleges that he asked appellees, many times, orally and in writing, to have him moved to the lower tier because of the danger that upper-tier housing and regular staircase use posed to him as a person with a seizure disorder.

Zamichieli admitted in his deposition, however, that before he fell and had a seizure, he did not submit a formal request for accommodation pursuant to PA DOC

4

Policy Number DC-ADM 006,[2] which governs requests for accommodations in the PA DOC system, nor an official grievance pursuant to PA DOC's general grievance policy, DC-ADM 804,[3] complaining about his upper-tier housing. The District Court therefore correctly entered judgment against Zamichieli on his unexhausted claims for an accommodation.

Zamichieli's claims related to his fall and seizure are different. After he exhibited signs of a seizure on February 13, 2017, the prison arranged for him to move to the lower tier the next day. While making that move, Zamichieli fell down the stairs and had a seizure. One day later, February 15, he filed a grievance pursuant to PA DOC's general grievance policy, DC-ADM 804, complaining that he fell down the stairs and had a seizure because he had been housed on the upper tier despite his Physician's Order for ground level housing and his repeated requests to several appellees to be moved to the lower tier. CHCA Nicholson issued an Initial Review Response on March 7, upholding the grievance to the extent Zamichieli was placed on the wrong tier but denying that it was deliberate: "An error was made in placing you on the upper tier, however it was not a malicious, intentional act to cause you harm in any way." JA 301. Zamichieli appealed to the Facility Manager on March 9, and SCI Greene received that appeal on March 13.

---

[2] Available at https://www.cor.pa.gov/About%20Us/Documents/DOC%20Policies/006%20Reasonable%20Accommodations%20for%20Inmates%20with%20Disabilities.pdf.

[3] Available at https://www.cor.pa.gov/About%20Us/Documents/DOC%20Policies/804%20Inmate%20Grievances.pdf.

Facility Manager Robert D. Gilmore issued an Appeal Response, echoing the results of the Initial Review Response, on April 14.

DC-ADM 804, Procedures Manual § 2(A)(2)(d) states, in relevant part,

> The Facility Manager/designee shall:
>
> > (1) notify the inmate using the Facility Manager's Appeal Response (Attachment 2-B) of his/her decision within 15 working days of receiving the appeal;
> >
> > . . .
> >
> > (4) the Facility Manager/designee may authorize an extension of up to ten additional working days if the investigation of the appeal is ongoing. If an extension is necessary, the inmate shall be advised in writing using the Extension Form (Attachment 1-E)[.]

More than fifteen working days elapsed between SCI Greene receiving Zamichieli's grievance appeal on March 13 and Facility Manager Robert D. Gilmore issuing his Appeal Response on April 14, and there is no evidence in the record that an extension was authorized or that Zamichieli was notified via an Extension Form. "[A]s soon as a prison fails to respond to a properly submitted grievance or appeal within the time limits prescribed by its own policies, it has made its administrative remedies unavailable and the prisoner has fully discharged the PLRA's exhaustion requirement." *Shifflett v. Korszniak*, 934 F.3d 356, 365 (3d Cir. 2019). As SCI Greene failed to timely respond to Zamichieli's appeal in accordance with its own policies, it made the third and final step of DC-ADM 804's grievance process unavailable, and Zamichieli fully discharged the PLRA's exhaustion requirement for claims based on his fall and seizure.

6

The District Court thus erred in finding that Zamichieli did not exhaust his claims related to his fall and seizure.

**B.    Genuine Disputes of Material Fact**

The record raises genuine disputes of material fact about the merits of whether any of the appellees were deliberately indifferent to Zamichieli's epilepsy and whether their deliberate indifference caused him to fall down the stairs and have a seizure.[4]

"To overcome a motion for summary judgment, a plaintiff [alleging deliberate indifference] 'must come forward with evidence from which it can be inferred that the defendant-officials were . . . knowingly and unreasonably disregarding an objectively intolerable risk of harm.'" *Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 259 (3d Cir. 2010) (omission in original) (quoting *Beers-Capitol v. Whetzel*, 256 F.3d 120, 132 (3d Cir. 2001)). "An inmate who is proceeding *pro se* is in a decidedly difficult position from which to generate 'record evidence' on his behalf. Under these circumstances, his affidavits are about the best that can be expected from him at the summary judgment phase of the proceedings." *Giles v. Kearney*, 571 F.3d 318, 326 (3d Cir. 2009) (cleaned up).

---

[4] Zamichieli can prove his fall-related claims by establishing defendants' deliberate indifference. *See Dooley v. Wetzel*, 957 F.3d 366, 374 (3d Cir. 2020) ("Prison officials violate an inmate's Eighth Amendment rights when they are deliberately indifferent to an inmate's serious medical need."); *S.H. ex rel. Durrell v. Lower Merion Sch. Dist.*, 729 F.3d 248, 261, 263 (3d Cir. 2013) ("[A] showing of deliberate indifference may satisfy a claim for compensatory damages under § 504 of the RA and § 202 of the ADA.").

Zamichieli testified at deposition that he told appellees Block Officers Price and Liptak, Unit Manager Tina Staley, Block Counselor Mr. Spiker, and Physician Assistant ("PA") Natalie D. Austin about his need to be moved to the lower tier. He testified that PA Austin knew he had a seizure disorder because she saw in his file that he was being treated with seizure medication. And he testified that he sent several appellees, including Corrections Health Care Administrator ("CHCA") William Nicholson and Medical Director Mike Hice, request slips asking to be moved to the lower tier.

But the record contains more than Zamichieli's uncounseled deposition testimony that he told seven of the appellees about his need to be moved to the lower tier. In support of his motion for summary judgment in the District Court, Zamichieli produced two such written requests addressed to several appellees: a Form DC-135A, Inmate's Request to Staff Member, dated January 5, 2017, about a week after he was first housed on the upper tier, addressed to CHCA Nicholson and cc'ed to Block Counselor Spiker and Unit Manager Staley among others; and a DC-500 Sick Call Request form dated January 10, 2017. Aff. Attach. 1, ECF No. 129-1 at 43–44 (Dec. 7, 2018).[5] The record also includes the PA DOC Physician's Order recommending that he be housed on the ground level for medical reasons; appellee CHCA Nicholson's statements in his Initial Review Response that Zamichieli "did have a lower bunk / lower tier order from the medical department as of 3/21/15," and "[i]t is a well-known practice that all inmates with documented seizure

---

[5] ECF Number cites are to the District Court docket, *Zamichieli v. PA DOC*, 2:17-cv-00742-CRE (W.D. Pa.), unless otherwise noted.

disorders are to be housed on lower bunk / lower tier status," JA 301; and the PA DOC's interrogatory responses stating "if an inmate is an epileptic, they are routinely placed on a bottom bunk on a bottom floor to prevent possible injuries from having a seizure while on a top bunk or up the stairs," that "[i]f a certain housing restriction is suggested, that information is in the computer but not why it was suggested," and "[d]efendants are aware that unit managers and security managers have access but are not aware if line staff do," JA 218–19.

> Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious. For example, if an Eighth Amendment plaintiff presents evidence showing that a substantial risk of inmate attacks was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus 'must have known' about it, then such evidence could be sufficient to permit a trier of fact to find that the defendant-official had actual knowledge of the risk.

*Farmer v. Brennan*, 511 U.S. 825, 842–43, 114 S.Ct. 1970, 1981–82 (1994) (cleaned up).

The record contains considerable evidence showing that Zamichieli's serious medical need to be housed on the lower tier, and the substantial risks associated with that need, were documented and expressly noted by prison officials in the past. The record also contains evidence and circumstances suggesting that several appellees were exposed to information concerning that risk. Taken together, such evidence could lead a reasonable jury to conclude that one or more appellees knew that Zamichieli was

epileptic and had a serious medical need to be housed on the lower tier, lest he be at substantial risk of falling down the stairs or having a seizure.

The record also contains genuine issues of material fact about which appellees could have ensured that Zamichieli was housed on the lower tier, either when he arrived at SCI Greene or soon after. In an interrogatory response, PA DOC stated that "when an inmate is brought into the facility, they are assessed and if special housing considerations are needed they are documented at that time[,]" and "[h]ousing recommendations are made by medical. Actual bed assignments are entered by unit staff." JA 218, 228. But it does not identify which unit staff is directly responsible for cell assignments. And appellee CHCA Nicholson's Initial Review Response to Zamichieli's grievance stated "I assure you that the medical department did not receive any written requests from you or this human error would have been corrected," and "[a]ny of the staff that you notified of this error would have been able to correct it, if you notified them in writing." JA 301. It is difficult to believe that prison officials could not, without a written request to do so, reassign a known epileptic inmate to housing that comported with the inmate's extant PA DOC Physicians Order and eliminated the substantial risk that the inmate would fall or have a seizure while walking up or down the stairs. But even if that were the case, Zamichieli both testified that he submitted written requests to several appellees and produced two of those requests.

Those facts, taken together, could lead a reasonable jury to conclude that one or more of the appellees could have ensured Zamichieli had medically appropriate housing.

10

Further explication of what each specific appellee knew and was able to do is best resolved by thorough fact examination.

And if a reasonable jury could conclude that one or more appellees knew that Zamichieli should have been housed on the lower tier, and that those appellees were able to have him assigned to the lower tier but did not do so, it follows that a reasonable jury could infer that appellees' failure to have him housed on the lower tier was deliberate. Appellee CHCA Nicholson stated in his Initial Review Response that Zamichieli's placement on the upper tier "was not a malicious, intentional act to cause you harm in any way." JA 301. But that is merely one defendant's self-serving assertion of his and his fellow defendants' states of mind, which a reasonable jury may disbelieve due to evidence supporting the contrary inference. *See, e.g.*, *Rose v. Clark*, 478 U.S. 570, 581, 106 S. Ct. 3101, 3107–08 (1986) (citations omitted) ("No one doubts that the trial court properly could have instructed the jury that it could *infer* malice from respondent's conduct. Indeed, in the many cases where there is no direct evidence of intent, that is exactly how intent is established."). The evidence in the record, reasonably construed in the light most favorable to Zamichieli, supports the inference that one or more of the appellees knew of and chose to disregard an objectively intolerable risk of harm to Zamichieli, such that summary judgment for appellees on that point is inappropriate.

Finally, it bears noting that Zamichieli's claims related to his fall and seizure can take the form of any of several similar theories of liability. They could be based on the initial decision to house Zamichieli on the upper-tier upon his release into the general population at SCI Greene despite his documented medical housing recommendation.

11

They could be based on the subsequent decision to keep him on the upper tier despite that recommendation and his repeated requests to be moved. Or they could be based on Zamichieli's claims in his Amended Complaint and his deposition testimony that when he was finally being moved to the lower tier, he was rushed by prison officials, without their help, both up the stairs to get his things and then back down the stairs with his things, despite those officials' knowledge that Zamichieli should not have been taking the stairs in the first place, causing his injuries. *See* JA 93 ¶ 71 ("I fell down the steps while moving my property and bedding etc to a lower tier cell . . . . All defendants was deliberate indifferent . . . by housing me on upper tier and requiring me to move my own property and required me to repeated use staircase to move which required for me to go back up staircase against my medical restrictions. Mr. Spiker ordered for me to go back upstairs, I followed his direct order and was rushed by him and other officers while moving, it caused me to panic and caused a seizure attack which I'm on Kepra for, caused me to fall down metal staircase . . . ."); JA 401 at 101:2–402 at 105:7 (deposition testimony describing the move, including that he asked Counselor Spiker and Block Officer Price for help and they hurried him, and "I told Spiker that I was dizzy and then I don't want to risk going up the steps again, because I don't know, I could have a seizure. I didn't want to risk it, could you have somebody move my property. He ordered me to go and move my property anyway, which I did, I followed his ordered and moved my property."). Which of these theories to proceed on is best left to trial counsel. *See generally Montgomery v. Pinchak*, 294 F.3d 492, 502 (3d Cir. 2002) ("[A] § 1983 civil

12

rights case alleging deliberate indifference to a prisoner's serious medical needs can raise sufficiently complex legal issues to require appointment of counsel.").

## II. Zamichieli's First Amendment Retaliation Claims

Zamichieli also claims that after he filed grievances against prison medical staff, two of them retaliated by bringing misconduct charges against him, and prison officials further retaliated by transferring him from SCI Greene to SCI Huntingdon. The District Court entered summary judgment against Zamichieli on those claims, holding that "given the quantum of evidence of Plaintiff's misconduct, there is no genuine issue of material fact that the disciplinary action taken was reasonably related to legitimate penological interests," JA 47, and that Zamichieli failed to adduce sufficient evidence of retaliation underlying the transfer. We affirm those conclusions.

Both claims stem from interactions Zamichieli had with two female members of the medical staff at SCI Greene. Shortly after his fall, PA Austin brought a misconduct charge against Zamichieli, because he purportedly exposed himself to her. Zamichieli first responded by lodging a Prison Rape Elimination Act complaint claiming that Austin sexually assaulted him. He withdrew that complaint, but filed a broader grievance soon after, alleging not only that she sexually assaulted him, but also that she delayed his treatment in retaliation for his filing the grievance related to his fall and seizure. He reiterated his retaliation claim when contesting the misconduct charge. One month later, Certified Registered Nurse Practitioner ("CRNP") Lori Ridings filed a misconduct charge against Zamichieli for exposing himself to her and engaging in inappropriate sexual

13

behavior in front of her. Zamichieli then filed a grievance alleging that CRNP Ridings brought the charge against him in retaliation for his grievances against Austin.

Hearing Examiner D. Benner found Zamichieli guilty of both sets of misconduct charges based on a preponderance of the evidence in each case. Zamichieli appealed both decisions to the prison's Program Review Committee, which denied both appeals, finding in each that "no violation of DOC policy or procedure(s) occurred" and "the evidence presented supports the findings of the Hearing Examiner." JA 326, 342. Zamichieli filed a second-level appeal of at least the misconduct ruling based on CRNP Ridings' allegations, which was similarly denied.[6]

A prisoner's First Amendment retaliation claim fails if prison officials prove "that they would have made the same decision absent the protected conduct for reasons reasonably related to a legitimate penological interest." *Rauser v. Horn*, 241 F.3d 330, 334 (3d Cir. 2001). On summary judgment, "we evaluate . . . 'the quantum of evidence' of the misconduct to determine whether the prison officials' decision to discipline an inmate for his violations of prison policy was within the broad discretion we must afford them[,]" or whether "a reasonable fact finder could conclude that the misconduct was issued in retaliation for [the protected conduct], and not in furtherance of legitimate penological goals." *Watson v. Rozum*, 834 F.3d 417, 426 (3d Cir. 2016).

---

[6] It is unclear from the record whether Zamichieli filed a second-level appeal of the misconduct ruling based on PA Austin's allegations.

No reasonable factfinder could conclude, on the evidence in this case, that either the misconduct rulings or Zamichieli's transfer were the result of anything other than Zamichieli's misconduct. Zamichieli was found guilty of the disciplinary charges brought by CRNP Ridings based not only on her testimony, but also video evidence. And while it seems Zamichieli was found guilty of the disciplinary charges filed by PA Austin based solely on the Hearing Examiner crediting Austin's written report over Zamichieli's, there is significant record evidence supporting that credibility determination. Zamichieli has three pending cases in the United States District Court for the Middle District of Pennsylvania in which, like his claims against PA Austin, he alleges officials at various PA DOC facilities sexually assaulted him. *See* Appellant's Br. at 3 (listing *Zamichieli v. DelBalso*, 3:17-cv-01898-MEM-DB; *Zamichieli v. Ficks*, 3:18-cv-00850-MEM-DB; and *Zamichieli v. Merritts*, 3:20-cv-00180-MEM-DB). Further, in his statement disputing PA Austin's allegation that he exposed himself to her, Zamichieli stated "I do take full responsibility for past actions in regards of prior misconducts in this nature at other facility prior to transfer here at SCI Greene, and I apologize!" JA 137. And both PA DOC's Permanent Transfer Petition for Zamichieli's spring 2017 transfer from SCI Greene to SCI Huntingdon and an affidavit from appellee Superintendent's Assistant Tracy Shawley state that Zamichieli was transferred from Greene to Huntingdon to separate him from education staff member Dr. Kelly due to "inappropriate and unpleasant request slips," ECF Nos. 104-4, -5 (Nov. 5, 2018), which echoes the inappropriate writings Zamichieli admitted to showing PA Austin, JA 393 at 72:24–394 at 75:3.

15

As no reasonable jury could conclude that either of the challenged disciplinary charges sustained against Zamichieli or his transfer from SCI Greene to SCI Huntingdon were made in retaliation for his filing grievances rather than for a legitimate penological purpose, those claims do not survive summary judgment.

\* \* \*

For the foregoing reasons, we will affirm the District Court's entry of summary judgment on Zamichieli's retaliation claims, affirm in part and reverse in part the District Court's entry of summary judgment on Zamichieli's Americans with Disabilities Act, the Rehabilitation Act, and Section 1983 Eighth Amendment claims, and remand the cause to the District Court to reinstate proceedings not inconsistent with this opinion.

*Zamichieli v. Pennsylvania Department of Corrections*, No. 19-3305
PHIPPS, *Circuit Judge*, dissenting in part

I join the Majority Opinion except for its ruling on inmate Lamont Zamichieli's

claim related to his fall from an upper-tier cell. By permitting that claim to proceed to

trial against fourteen individual-capacity defendants, the Majority Opinion embraces and

endorses Zamichieli's sue-the-whole-prison approach to litigation. That is wrong for

several reasons: it improperly collectivizes individual-capacity liability; it indulges in a

host of broad, unwarranted inferences; it flips the burden of proof; and it conflicts with a

decision of one of our sister circuits on very similar facts. *See Est. of Miller v. Marberry*,

847 F.3d 425, 428 (7th Cir. 2017). I would affirm the District Court's entry of summary

judgment against Zamichieli on all counts, and I respectfully dissent in part.

To prevail on his Eighth Amendment claim, Zamichieli must show that the

defendants acted with deliberate indifference. That is an exacting standard. It requires

more than negligence or even gross negligence; it requires criminal recklessness. *See*

*Farmer v. Brennan*, 511 U.S. 825, 839–40 (1994). To meet this standard, an official

must know that an inmate faces a substantial risk of serious harm and must disregard that

risk by failing to take reasonable measures to abate it. *See Parkell v. Danberg*, 833 F.3d

313, 335 (3d Cir. 2016) (quoting *Chavarriaga v. N.J. Dep't of Corrs.*, 806 F.3d 210, 229

(3d Cir. 2015)).

On this record, Zamichieli fails to establish a triable issue with respect to

deliberate indifference. It is undisputed that Zamichieli never completed the required

form to request a cell reassignment but that once he had a seizure, he was reassigned

1

from an upper-tier cell to a lower-tier cell within about 24 hours. Such a reassignment was unquestionably a reasonable response to his condition. While removing his belongings from the upper-tier cell as part of the cell reassignment, Zamichieli fell, possibly due to a second seizure. The record evidence, however, does not permit a finding that any individual-capacity defendant acted with deliberate indifference in not reassigning Zamichieli to a lower-tier cell before his first seizure.

I.   **A REASONABLE JURY COULD NOT FIND THAT ANY DEFENDANT HAD A SUBJECTIVE AWARENESS OF THE RISK OF HARM POSED BY ZAMICHIELI'S CELL ASSIGNMENT.**

The Majority Opinion concludes that the record evidence would allow a reasonable jury to find that all fourteen individual-capacity defendants knew that Zamichieli faced a substantial risk of serious harm before his first seizure. The lynchpin evidence for the Majority Opinion is the physician's order for Zamichieli to have a ground-level cell. Two facts greatly diminish the probative value of that order.

First, the mere existence of the order does not mean that each of the fourteen individual-capacity defendants had knowledge of the order's contents. At most, the record evidence could support a finding that one – and only one – of the defendants, Natalie Austin, a Physician Assistant, read the order before Zamichieli fell. Short of supplementing the record with abject conjecture, nothing supports the conclusion that any other defendant had knowledge of the order's contents.

Second, the physician's order is conclusory and does not state why Zamichieli needed a lower-tier cell. Any number of reasons unrelated to a serious risk of substantial harm could support such a conclusion. The physician could have checked the box (and it

2

is only a box on the form) for a lower-tier cell to account for mobility or accessibility concerns – not for a serious risk of substantial harm. Also, the form's omission of an explanation is legally significant because an explanation *that the form lacks* cannot be imputed to the one individual-capacity defendant who read the form, much less to the other defendants who did not and had no obligation to do so. Thus, the physician's order does not provide a sufficient basis to overcome summary judgment.

Nor does the remaining record evidence of the individual-capacity defendants' knowledge create a triable issue. The Majority Opinion vastly overvalues Zamichieli's oral and written requests for a lower-tier cell based on his seizure disorder. There is no evidence that Zamichieli made those requests to all fourteen individual-capacity defendants. Construed most liberally, the evidence could allow a finding that Zamichieli made requests of seven of them: William Nicholson, Tina Staley, Natalie Austin, Block Counselor Spiker, Corrections Officers Liptak and Price, and Tracey Shawley. But prison officials are not required to believe everything that inmates tell them. To the contrary, the caselaw legitimizes a healthy amount of skepticism with respect to information received from prisoners. *See Marberry*, 847 F.3d at 428 ("Prisoners can be manipulative, using deceit to obtain advantages; guards are accordingly entitled to be skeptical.").[1] Thus, none of the seven individual-capacity defendants with whom

---

[1] *See also Hudson v. Palmer*, 468 U.S. 517, 526 (1984) ("Prisons, by definition, are places of involuntary confinement of persons who have a demonstrated proclivity for antisocial criminal, and often violent, conduct. Inmates have necessarily shown a lapse in ability to control and conform their behavior to the legitimate standards of society by the normal impulses of self-restraint; they have shown an inability to regulate their conduct in a way that reflects either a respect for law or an appreciation of the rights of others.").

Zamichieli communicated were obligated to believe his story without additional corroborating evidence.

That leaves only one individual-capacity defendant, Natalie Austin, who had read the physician's order and was told by Zamichieli about his seizure disorder before his first seizure. Critically, the knowledge of the risk of harm is evaluated subjectively – based on the awareness that each defendant had. *See Farmer*, 511 U.S. at 837. Under that standard, a reasonable jury could not find that any defendant other than Austin knew that Zamichieli faced a substantial risk of serious harm from his upper-tier cell assignment, and summary judgment was properly entered for those defendants.

Instead of accounting for those shortcomings in the record evidence, the Majority Opinion imputes knowledge of the physician's order and Zamichieli's statements to all fourteen individual-capacity defendants, and then holds them responsible for not instantly believing Zamichieli's story. But collectivizing liability is not how summary judgment works – especially under the subjective deliberative-indifference standard that examines the mental state of each individual defendant.

## II. THE RECORD EVIDENCE DOES NOT CREATE A TRIABLE ISSUE ON WHETHER ANY INDIVIDUAL-CAPACITY DEFENDANT DISREGARDED A SUBSTANTIAL RISK OF SERIOUS HARM TO ZAMICHIELI.

The deliberate-indifference standard also requires proof that a defendant disregarded a substantial risk by failing to take reasonable measures to abate it. The Majority Opinion offers little factual support or legal analysis for its conclusion that all defendants must go to trial on this issue. Instead, the Majority Opinion relies on a string

4

of suppositions: *if* one or more individual-capacity defendants knew that Zamichieli should have been housed on the lower tier, and *if* any individual-capacity defendant could have reassigned Zamichieli, *then* a reasonable jury could *infer* that the failure to transfer Zamichieli was deliberate.

For the first link in that chain of inferences, the evidence would allow a reasonable jury to conclude that only one of the defendants, Austin, had the requisite knowledge before Zamichieli's seizure. But Austin was not employed by the prison. Instead, she, along with at least two other defendants – Lori Ridings and Mike Hice – was employed by the prison's outside medical contractor. And as an employee of an outside contractor, it is undisputed that Austin did not have authority over inmate cell assignments. *See Marberry*, 847 F.3d at 428 ("Prisons respond to the risk of manipulative conduct by exploiting the division of labor – for example, by allocating bunk-assignment duties to guards who have computer terminals that enable them to check prisoners' assertions."). Thus, even if a jury found that Austin had the requisite knowledge, she could not be liable for failing to reassign his cell because she lacked that authority.

Even without the ability to reassign Zamichieli's cell, Austin offered to help him. She explained that, to obtain a lower-tier cell, he needed to complete an accommodation form, and she offered to help him complete it. In light of the scope of her authority, that is a reasonable response, making it legally impossible for her to be deliberately indifferent. *See Farmer*, 511 U.S. at 844–45 (explaining that a reasonable response to a known risk absolves prison officials of liability under the Eighth Amendment). While

5

Austin's actions were not enough to deter Zamichieli from suing her, they are more than sufficient to prevent a federal court from permitting his claims against her to go to trial.

### III.    THE MAJORITY OPINION CONFLICTS WITH ONE OF OUR SISTER CIRCUITS, AND IT IMPROPERLY SHIFTS THE BURDEN OF PROOF.

On very similar facts, the Seventh Circuit reached the opposite conclusion. In that case, *Estate of Miller v. Marberry*, 847 F.3d 425 (7th Cir. 2017), an inmate had a doctor's order in his file that he be assigned to a lower bunk but was assigned to an upper bunk. *See id.* at 426; *see also id.* at 429 (Posner, J., dissenting). The inmate told prison guards that he had a brain tumor and needed a lower bunk. *See id.* at 426. But he was not reassigned, and he fell from the bunk and broke his back. *See id.* at 426–27. The Seventh Circuit rejected the inmate's claim because he did not sue "the people responsible for bunk assignments." *Id.* at 427. The Seventh Circuit also explained that prison guards were not obligated to believe an inmate's reports of his own health, especially when the inmate did not follow the proper process for requesting a bunk reassignment. *See id.* That is a lot like this case, except unlike the Majority Opinion here, the Seventh Circuit examined the responsibilities of each defendant along with each defendant's knowledge of the inmate's condition, and it also accounted for the inmate's failure to follow the proper process for seeking a bunk reassignment.

By avoiding those issues, the Majority Opinion has improperly shifted the burden of proof. According to the Majority Opinion, once an injured inmate comes forth with evidence that an unspecified worker at the prison – not necessarily even a prison employee – likely knew of an inmate's risk of harm, then all defendants must prove that

6

they lacked such knowledge and that they took reasonable measures to abate the risk. Although it may be challenging for *pro se* inmates to litigate conditions-of-confinement claims, Eighth Amendment jurisprudence does not recognize *res ipsa loquitur* or some other form of burden-shifting. But here, the Majority Opinion does exactly that: it places the burden on individual-capacity defendants to disprove their deliberate indifference. That is legally incorrect.

* * *

For these reasons, I respectfully dissent in part and would affirm the judgment of the District Court.